**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**DILL COMPANY, Respondent.**

No. 13357.

United States Court of Appeals Third Circuit.

Argued Jan. 12, 1961.

Decided Aug. 8, 1961.

Karl Schmeidler, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attys., Dept. of Justice, Washington, D. C., on the brief), for petitioner.

Logan Morris, Philadelphia, Pa. (John C. Noonan, Nesbit, Morris, Pugh & Noonan, Philadelphia, Pa., on the brief), for respondent.

Before GOODRICH, McLAUGHLIN and FORMAN, Circuit Judges.

FORMAN, Circuit Judge.

The Dill Company, a Pennsylvania corporation is the owner of a trade-mark, Espotabs, under which it manufactured and sold a pharmaceutical laxative prod-uct. For some time prior to April 18, 1949, Eastco Laboratories, Inc.,[1] a Delaware corporation, negotiated with it for a license to use the trade-mark and manufacture the product. On that date they entered into an agreement under which The Dill Company licensed Eastco Laboratories, Inc. to use the trade-mark and manufacture and sell the product made under it for a period of five years commencing May 1, 1949 for a royalty equal to ten percent[2] of the net sales as defined therein. The agreement further provided that:

"6. If this license shall be in force April 30, 1954, Licensee shall have the right and option either:

"(a) To purchase as of the close of business on said day at a purchase price of $350,000, all of Licensor's right, title, and interest in and to said trade-mark, Espotabs including the label and dress of said distinctive package used in connection therewith, and to the product heretofore manufactured and sold by it under said trade-mark Espotabs and to all rights appurtenant thereto including whatever rights it may have in the trade-mark Espotabs and to the formulae and all other information which it may have relating to the manufacture and sale of the product sold under the trade-mark Espotabs and that part of the good will of Licensor's business connected with the use of, and symbolized by, said trade-mark Espotabs; election to exercise which right and option to purchase shall be made by Licensee giving to Licensor a written notice of its election to exercise such right and option and paying the said purchase price to Licensor on or before said April 30, 1954; or

"(b) To extend the term of this license until April 30, 1959, upon the same terms and conditions so far as applicable, by Licensee giving to Li-

1. In 1952 Eastco Laboratories, Inc. changed its name to Espotabs Corporation.

2. Royalties were payable semi-annually with a minimum of $25,000 for the year ending April 30, 1950 and a minimum of $20,000 each year thereafter.

censor written notice of its election to exercise such right and option by paying to the Licensor $50,000 on or before said April 30, 1954 in addition to any royalties which may be then payable.

"If the terms of this license shall be extended pursuant to the foregoing provisions, then Licensee shall have the right and option to purchase as of the close of business of any calendar month thereafter during such extended term at a price of $300,000 all of Licensor's right, title, and interest in and to said trademark and in and to all of the other property and rights appertaining thereto and described in paragraph (a) of this section; election to exercise which right and option to purchase shall be made by Licensee giving to Licensor a written notice of its election to exercise such right and option and paying the said purchase price of $300,000 to Licensor on or before the effective date specified in such notice of election."

3. The following letters incident to the exercise of the right to extend the license were exchanged:
"Espotabs Corporation
110 Mamaroneck Ave.,
White Plains, N.Y.
"*Registered Mail*
"April 27, 1954
"The Dill Company
"% Montgomery Trust Company
"Norristown, Pennsylvania.
"Gentlemen:
"We hereby give you notice of our election to extend the term of our license agreement until April 30, 1959 under the provision of paragraph (b) on page 9 of that agreement. We enclose our certified check in the amount of $50,000.
"We shall appreciate your acknowledgement of the receipt of this letter and our check by signing and returning to us the enclosed carbon copy.
"Very truly yours,
"Espotabs Corporation
"Ivan D. Combe
"President"
"IDC:ti
"enc. 1
"check 1
"Received the original and the foregoing letter and the above described enclosure

On April 27, 1954, the licensee exercised its right to extend the term for a further period of five years ending April 30, 1959 and paid the licensor $50,000 in accordance with the agreement.[3]

The licensor entered the receipt of the payment in its journal on April 29, 1954, as follows:

| | "Debit | Credit |
|---|---|---|
| Cash—General Account | $50,000.00 | |
| Profit and Loss | | $50,000.00 |
| Amount received from Espotabs Corporation to extend term of license agreement until April 30, 1959." | | |

The Dill Company reported the receipt of the payment of $50,000 in its 1954 income tax return as a long term capital gain realized from the sale of the trademark, which had a zero basis.

The Commissioner of Internal Revenue determined that the $50,000 payment constituted ordinary income taxable in 1954 and that there was a deficiency in tax.

on this 28th day of April 1954.
"By The Dill Company
"Russell M. Troutman
"Its President"
"The Dill Company
"Manufacturing Chemists
"Norristown, Pennsylvania
"April 29, 1954
"Espotabs Corporation
"110 Mamaroneck Ave.,
"White Plains, New York.
"Attention: Ivan D. Combe
"Dear Mr. Combe:
"This will acknowledge receipt of your check for the amount of $50,000 in accordance with Paragraph (B) on Page 9 of the Espotab License agreement.
"Having elected to extend the License Agreement until April 30, 1959, we wish you every success in promoting the sale of Espotabs.
"Yours very truly,
"The Dill Company
"Russell M. Troutman
"President
"RMT:CEM
"Encl."

A petition was filed in the Tax Court of the United States for a redetermination of the deficiency.

The Tax Court decided that there was an overpayment in income tax for the year 1954 because the character of the $50,000 payment could not be determined until either the option to purchase was exercised or lapsed and it was therefore not includible in its income until that time.[4]

In coming to its conclusion the Tax Court held:

"* * * We are of the opinion that the agreement as a whole clearly indicates that a purchase price of $350,000 was contracted for; and that this price was applicable, not only at the end of the initial 5-year term, but also throughout the extended term of the agreement. True, as respondent contends, the contractual language does not expressly provide for a credit of the $50,000 against the purchase price. The agreement provides that 'If the term of this license shall be extended * * * then Licensee shall have the right and option to purchase * * * during such extended term at a price of $300,000 * * *' However, we believe that this language implies a tacit understanding that the $50,000 was to be credited on the originally agreed purchase price of $350,000, especially when it is read in the light of the agreement as a whole * * *"

*   *   *   *   *   *

"* * * [W]e are of the opinion that the $50,000 payment was intended to serve both as consideration for the extension of the agreement and as a payment on account of the purchase price should the option to purchase be exercised."

The Tax Court then addressed itself to the problem of deciding which of these purposes determined the year in which the $50,000 should be included in the gross income of The Dill Company. It held further:

"Inasmuch as we have concluded that the $50,000 was intended as a credit on the purchase price of the trade-mark, in the event the option to purchase was exercised by the licensee, we are of the opinion that its character could not be determined until either the option to purchase was exercised or lapsed; and therefore, * * * the $50,000 is not includible in petitioner's income until that time."

In his petition to this court for review the Commissioner submitted that the Tax Court erred in failing to hold that the entire payment of $50,000 was made for the extension of the license and that it was taxable when received in 1954 and in the alternative, if the Tax Court's conclusion that the payment was for the dual purpose of extending the option to purchase and as a part of the purchase price is accepted then the case should be remanded to ascertain the amount allocable to the license extension. He stated:

"The primary issue on appeal relates to the character for tax purposes of the $50,000 received by the taxpayer from its license in 1954—whether this payment was received for a license extension and, hence, represented payment of additional royalties; or whether it represented payment on account of the purchase price in case the licensee exercised the option to purchase."

As factual support for his contention the Commissioner pointed to the license agreement itself from which he argued that it gave the licensee three alternatives:

"* * * (1) the licensee could purchase the trade-mark on April 30, 1954, for $350,000; (2) it could extend the term of the agreement for an additional five years by paying $50,000 on or before April 30, 1954, in addition to the stipulated percentage royalty; and (3) if the

4. The Dill Company v. C. I. R., 1959, 33 T.C. 196.

term of the agreement were extended and in force, the licensee could purchase the trade-mark during the extended period for $300,000. Thus, the agreement makes the exercise of the option to purchase the trade-mark during the second five-year period dependent upon the payment of the $50,000 to extend the term of the agreement in order to keep it in force. Under such circumstances, the $50,000 was given in consideration for the continued use of the property. * * *"

As an indication that the payment was solely for the extension of the license agreement the Commissioner argues that the language in Paragraph 6 compels the conclusion that "the $50,000 was not to be applied against the $300,000 purchase price." He further asserts that it was to the licensee's advantage to have the term of the agreement extended for it was clear that the continued use of the trade-mark had value and that it was a reasonable inference from the fact that the licensee continued to pay royalties rather than to put up the $300,000 to acquire the trade-mark that the license terms were so favorable that it was worth $50,000 to simply extend the agreement for five more years and that it "might well be worth some additional cost to the licensee to avoid risking the $300,000 until the last possible moment in case some unforeseen development should have made the trade-mark worthless."

The Commissioner also urges that the notification by the licensee of April 27, 1954 and the licensor's acknowledgement thereof as well as the licensor's journal entry of the receipt of the payment all make reference only to the extension of the agreement.

Aside from the support this documentary evidence gives his position the Commissioner submits that it is strengthened by the testimony of the president of the licensee, who conducted the negotiations in its behalf. It was to the effect that his interpretation was that the $50,000 payment was for the extension of the license for the second five years. And as for the testimony of the licensor's witnesses that the $50,000 payment was applicable to purchase price the Commissioner argued that it was self serving and refuted by the other evidence and testimony.

The evidence, both documentary and oral, raised a fact question for the Tax Court as to the purpose of the $50,000 payment. The relationship between the licensor and the licensee was fixed in the one agreement of April 18, 1949. It provided the conditions to be mutually met including the payment of royalties by the licensee for five years ending April 30, 1954, and gave the option to the licensee to purchase all of the rights of the licensor in its trade-mark for $350,000 providing the license was in force on that date. As an alternative the agreement provided for its extension for another five year period until April 30, 1959, upon the same terms and conditions, if the licensee gave to the licensor written notice of its election and paid $50,000 on or before April 30, 1954, in addition to any royalties then payable. It further provided that under such extension the licensee should have the right at the close of any calendar month thereafter to purchase the licensor's said rights for $300,000.

The evidence disclosed that the agreement was the culmination of considerable negotiations. The licensee sought a term of ten years during which royalties would be paid before it was required to exercise an option to purchase the trade-mark and rights thereunder for a price fixed at $350,000. The licensor was unwilling to grant the license under that condition. The parties then came to an understanding that after the first five years if the agreement was to be extended upon the same royalty basis the licensee should pay $50,000 and it would have the right at any time during the second five year period to purchase the trade-mark and rights for $300,000. It is true that the agreement did not specify in so many words that the $50,000 payment was to be credited upon the

purchase price of $350,000. It is likewise true that the agreement did not characterize the $50,000 as an addition to the royalty. It is a certainty that if the option were to be exercised the licensor would receive only $300,000 in addition to the $50,000 paid at the expiration of the first five years.

In effect, the Tax Court ruled that the $50,000 payment held open the option to purchase for $350,000 for as much as a second five year period. If the option were exercised it became a down payment on that price and only $300,000 would be due. Although not stipulated in the agreement it was conceded if the option were not exercised the payment would be forfeited.

The taxpayer's witnesses were its attorney for many years and a member of its Board of Directors, Mr. Aaron S. Swartz, and Mr. Melvin L. Carl, president of a bank which was trustee for the estate of the majority stockholder of the taxpayer, also a member of the Board of Directors. Both participated in all negotiations with the licensee. Both testified in effect that the sale price of the trade-mark was $350,000 and if at the end of the first five year term $50,000 were paid on account of the $350,000 and the remaining $300,000 paid at any time during the extended five year period the licensee would become the owner in full of the trade-mark.[5]

Mr. Ivan D. Combe, president of and negotiator for the licensee, the only witness produced by the Commissioner, testified that it was his interpretation that the payment was for the extension of the license agreement for the second five years.[6]

---

5. Mr. Swartz testified:
"* * * I think I said first the amount of the royalty was discussed and finally agreed upon as ten percent. Then the question came up as to the option to purchase, and the amount of the purchase price was thoroughly discussed quite at length and finally agreed upon as $350,-000.
"Then the further question came up, they wanted a somewhat longer term to determine, as I understood, the advisability of purchase, and a further period of five, years was considered and it was finally agreed that it would be continued at the same royalty basis by the payment of $50,000 which would go on account of the purchase price at any time after the first five years during the extension—any time that it could be transferred by the payment of an additional $300,000, giving credit for the $50,000 which had been paid."
Mr. Carl testified:
"After negotiations we arrived at a figure of $350,000 as being the sale price for the trademark. Further discussions led to the feeling that probably Eastco Laboratories should have a longer term before they had to finally purchase the trademark to pay for it in full, and we agreed eventually that we would extend the term from five to ten years if at the end of the five-year period $50,000 were paid on account of the $350,000 and the remaining $300,000 would be paid at any time during the extended five-year period, which would permit Eastco Laboratories to become owners in full of the trademark."

6. Mr. Combe testified:
Then we got around to a proposition. For one reason or another we got away from the proposition where we were to take over the rest of the business and we started concentrating on making a deal for Espotabs. It seemed that when we negotiated to make a deal for Espotabs only, a license arrangement for Espotabs alone, then the price started to go up and I am sure we didn't push it up.
"I recall a step-up in my own mind— possibly in no one else's—but in my own mind it went up to $300,000 and then to $350,000. Then there came a situation where ten years seemed like a long time to our friends with whom we were negotiating without our paying anything. A ten year arrangement, pay nothing, and at the end of ten years have a $350,000 option.
"I recall then there was a request for consideration of a payment of $50,000 at the end of five years, setting it up on the basis of a five-year arrangement and then a $50,000 payment at the end of five years in order to keep on with the same arrangement for another five years.
"According to my recollection, we acceeded to that on the basis that in the ensuing five year period the option price which had been held firmly to $350,000 would go down to $300,000—both of which prices, I might say, seemed very, very high to me at the time at the going

The Tax Court was not persuaded that the terms of the license agreement and the other documentary evidence such as the licensee's notice of extension, the taxpayer's acknowledgement thereof and its treatment of the payment on its books, proved that the payment was made *as additional royalty* for the extended five year term of the license. Nor was it impressed with the testimony of the Commissioner's witness—the licensee's president—that it was his interpretation that the payment was for the extension of the license agreement for the second five years. Rather, it chose to credit the two witnesses presented by the taxpayer both of whom had likewise been present throughout the negotiations which resulted in the agreement.

We cannot say that it clearly erred in concluding that "the $50,000 payment was intended to serve both as consideration for the extension of the agreement, and as a payment on account of the purchase price should the option to purchase be exercised." Its finding that the $50,000 served the purpose of keeping the option to purchase open for a second period of five years did not militate against the reasonableness of its holding that it was likewise to be a credit upon the purchase price of the trademark of $350,000 if the licensee exercised its option.

For the law of the case the Commissioner relies principally upon Gilken Corporation v. Commissioner, 6 Cir., 1949, 176 F.2d 141 and Gordon's Estate et al. v. Commissioner, 6 Cir., 1953, 201 F.2d 171.

In Gilken the taxpayer (Gilken Corporation) leased its apartment hotel on July 10, 1940 for ten years. One of the clauses of the lease provided that upon the execution thereof the lessee should deposit $3,200 to be held by the lessor as security for the performance by the lessee of his obligations under the lease and to be applied to the last two months of the last year's rent (which was at the rate of $1,600 per month) provided the lessee should not be in default under the terms of the lease. Another clause gave the lessee an option to purchase the premises for $125,000 within three years from the date of the lease. If the lessee fully performed all of the conditions to which he was bound and exercised his option the lessor, it was stipulated, would give credit and allow as payment on the purchase price $3,200 representing "a sum equal to that paid by the Lessee as security and for the last two months' rental of said term * * *."

On January 3, 1941 the lease was amended to show that the lessee had deposited $5,000 over and above the $3,200 to be applied along with the $3,200 upon the last five months of the last year's rental and it was agreed that in case the option to purchase were exercised the $5,000 in addition to the $3,200 should be credited and allowed as payment on the price. Certain reductions in the rate of the monthly rental payments were also agreed upon, in the event that the option was not exercised.

On April 29, 1942 still another amendment was made. It provided for expiration on December 31, 1942 instead of

---

rate of which business of that type sells for."

"Q. [Mr. Ray] The payment of the $50,000 was for the extension of the license agreement for the second five years, is that correct? A. [Mr. Combe] That is our interpretation, but that is what we are here to talk about, isn't it?

"The Court: But if the option is exercised, then that $50,000 is applied on the purchase price, isn't it?

"The Witness: Well, if we exercise the option, your Honor, then we will

pay $300,000 and we will own the business. If we had bought it at the end of five years we would have paid $350,000, and we have had four and a half years of time in which we have carried on this royalty arrangement.

"The Court: It is not as easy as I thought it was going to be.

"The Witness: I don't mean to disagree with what the previous witnesses have said, really, because I think we are all trying to bring out the facts."

June 30, 1950 and that the $8,200 "heretofore deposited with the Lessor as security under said lease, shall be applied upon and used for the payment of the rent for the last five months of the term as shortened herein as and when the rent becomes due for said months." The lease was forfeitable for non payment of rent for one month.

Before the Tax Court the taxpayer contended that the $8,200 was returnable in its year ending July 31, 1942 when applied to the last five months' rent by the agreement of April 29, 1942. The Commissioner maintained that the $3,200 received July 1, 1940 and the $5,000 received on January 3, 1941 were taxable when received. The Tax Court found in favor of the Commissioner. Gilken Corp. v. C. I. R., 1948, 10 T.C. 445.

On the taxpayer's petition for review the Court of Appeals for the Sixth Circuit supported the opinion of the Tax Court that the payments were primarily rent. It held that the payments of $8,-200, having been made to the taxpayer without any restriction on its use and without requiring it to hold the money in trust or set it aside in any manner, were to be considered as income, and taxable in the year received, under the so-called claim of right principle laid down in North American Oil Consolidated v. Burnet, 1932, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197.[7]

In the present case there is no such emphasis on the payment of the $50,000 as royalty. Royalty payments at the same rates were agreed upon for both five year periods of the agreement. While the Tax Court here found that the $50,000 payment was a condition precedent to the extension of the agreement for a second period of five years, it also found that the purchase price re-

mained at $350,000 through the entire life of the agreement with the $50,000 as a payment on account of the purchase price should the licensee exercise its option. The only issue in Gilken was whether the payments were taxable as income in the years in which they were received or as income in the year in which they were actually applied to the last five months' rent due under the lease. Here the tax character of the payments is drawn into issue namely whether the $50,000 payment shall be returned as income in the year it was received or whether in the event the option is exercised it may be returned as capital gain. We agree that the Tax Court properly distinguished this case from Gilken.

In Gordon's Estate v. Commissioner, supra, apparently not cited to the Tax Court nor considered by it, the taxpayer's decedent was an elderly widow, Mary G. Gordon, who inherited a theatre and business property from her husband. During the year 1946, one, Bein, became interested in acquiring the property and negotiated with the decedent concerning it. The negotiations culminated in the parties executing two instruments. The first, dated July 5, 1946, was designated "Contract to Lease with Privilege of Purchase". It provided for a term of 25 years from October 1, 1946. The purchase price was to be $125,000 payable $25,000 on or before October 1, 1946, and interest computed at the rate of 4½ percent per annum payable quarterly on the balance of the purchase price of $100,000. The lessee was given the privilege of purchase at any time at the expiration of six months after the death of Mary G. Gordon without premium or penalty. The lessee undertook obligations concerning maintenance of fire and other insurance and agreed to pay all real es-

---

7. "It was in this case that the Court first stated the doctrine in the following language:

"* * * If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent * * *" 286 U.S. 417, 424, 52 S.Ct. 613, 615.

Distinguished in Clinton Hotel Realty Corp. v. Com'r of Int. Rev., 5 Cir., 1942, 128 F.2d 968.

tate taxes and assessments, if any, ordinarily due in June 1947 and thereafter.

The other instrument, dated November 7, 1946, was designated "Indenture of Lease". It recited a consideration of $100,000, although immediately prior thereto Bein had paid decedent $25,000. It provided a payment of $1,125 each three months and represented a yield of 4½ percent on $100,000. In all other respects this agreement contained provisions similar to the instrument of July 5, 1946. Bein took possession of the property and made the quarterly payments until December of 1949 when he transferred his interest in the property to another who assumed the obligations thereunder.[8]

Prior to the execution of any instrument a certified public accountant had been consulted regarding the tax consequences which would result from the various transactions under consideration. Because of the capital gain involved in an outright sale and transfer of title and the advanced age of the decedent he advised that such a transaction would be most disadvantageous from a tax standpoint.

The petitioner took the position that in 1946 Bein became a lessee with an option to purchase; that the payment of $25,000 received by its decedent constituted an advance payment for the option which was not taxable until the option was exercised.

The Commissioner contended that the negotiations culminated in the outright sale of the property and decedent was taxable on the profit as a capital gain but if it was found that there was no sale in substance, then he argued that the $25,000 was includible in decedent's taxable income for 1946.

The Tax Court ruled (Estate of Gordon v. C. I. R., 17 T.C. 427) that no outright sale was consummated; that the lessee was in no way bound to complete the purchase or pay the $100,000; that the $25,000 payment was received by decedent under a claim of right with no provisions for its repayment and was includible in her taxable income for the year 1946, citing North American Oil Consolidated v. Burnet, supra.

On a petition to review the decision of the Tax Court the Court of Appeals for the Sixth Circuit affirmed per curiam on the opinion of the Tax Court and upon its decision in Gilken Corporation v. Commissioner, supra, and the cases there cited.

Again any analogy of this case to the present one fails. The time during which the option could be exercised was largely uncertain—at any time six months after the owner's demise running the term of the lease of twenty-five years. The primary purpose seemed to be to provide an elderly widow with an income for her lifetime and it was held in effect, that as such, the $25,000 payment was to be regarded as rent or income in advance and hence was includible in her taxable income when she received it.

In the instant case the Tax Court was constrained rather to follow Virginia Iron Coal & Coke Co. v. Commissioner, 4 Cir., 1938, 99 F.2d 919, 921. There the taxpayer entered into a contract on July 7, 1930 with the Texas Gulf Sulphur Company which provided that the Texas Company should have the right to purchase all of the stock of one of its subsidiaries or the mineral lands and rights owned by it for $3,750,000. It was further provided that the Texas Company could retain the right to exercise its option from year to year until 1935 by paying $300,000, on August 1, 1930 and $125,000 on August 1 in each succeeding year including August 1, 1934. All of such payments were to be credited as part of the purchase price if the option were exercised. The Texas Company was not obligated to make further payments in case it failed to exercise the option but in that event the taxpayer had the right to retain all the payments already made. The first payment of $300,000 was received by the taxpayer August 1, 1930. A second payment of $125,000

---

8. The option was never exercised. 17 T.C. at 430.

was received August 1, 1931. No further payment was ever made and on December 26, 1933 Texas Company notified the taxpayer that the option would not be exercised. In 1934 the taxpayer amended its returns for 1930 and 1931 and included therein as taxable income the sum of $300,000 for 1930 and $125,000 for 1931. In determining deficiencies the Commissioner, however, included in gross income for the year 1933 the sums of $300,000 and $125,000 on the ground that the transaction was not completed for income tax purposes until the Texas Company, in 1933, surrendered its option. The question involved was whether the amounts of $300,000 and $125,000 forfeited to the taxpayer under the option agreement, were taxable as income for the year 1933. The Court of Appeals for the Fourth Circuit affirmed the Board of Tax Appeals in upholding the contention of the Commissioner, commenting:

"* * * A reading of the option discloses, however, that at the time the payments were made it was impossible to determine whether they were taxable or not. In the event the sale should be completed, the payments became return of capital, taxable only if a profit should be realized on the sale. Should the option be surrendered it would then become certain, for the first time, that the payments constituted taxable income. Thus it will be readily seen that it was impossible to tax these payments in the year in which they were made. * * *"

"That, when it became possible to determine the character of the payments and to definitely ascertain that they were income to the taxpayer as payments for an option, that they should be taxed, is not to be disputed. * * *"

* * * * *

"The year 1933 was the year in which the Texas Company notified the taxpayer that it surrendered all rights under the option and was the year in which the tax attached to the payments. The situation is in no way affected by the fact that the money became the property of the petitioner when received." 99 F.2d at pages 921, 922.

The Commissioner contends that the Tax Court was mistaken in relying on the Virginia case

"since the payment was given in that case solely for an option to purchase property and not (as here) for a present consideration, i. e. additional rent or royalty for an extension of an existing lease or license for use of property."

He argued that the reliance on the Virginia case carried the analogy that in the ordinary option agreement the purchaser of the property does not enjoy the use of the property until he decides to purchase it and the payments have no significance other than to keep the offer to purchase open, while under the lease-option arrangement as in this case the payments "including any bonus payment" are designed to compensate the lessor for the use of his property prior to an exercise of the option to purchase.

The Tax Court, on the other hand, was convinced that the $50,000 payment, while indeed serving the purpose of keeping the offer to sell open for the second five years, also was an advance payment on the only purchase price, namely $350,000, in the event that the option was exercised. We cannot say that the failure to uphold the Commissioner's contention that the $50,000 simply became additional royalties was clearly erroneous. Implied in the acceptance of the contention is the conclusion that the purchase price of the trade-mark was reduced for the second five year period from $350,000 to $300,000. That conclusion the Tax Board would not make. On the contrary, on consideration of all of the evidence in the case it found that the purchase price remained the same—$350,000—upon which the payment of $50,000 was to be credited in the event that the option was exercised.

It is true, as submitted by the Commissioner, that in Virginia a "straight" option was involved while here the licensee actually had the use of the trademark. But the fact that the licensee here paid the stipulated royalties for that use must not be overlooked. We cannot agree that the application by the Tax Court of the principle of the Virginia case was error. See Doyle v. C. I. R., 2 Cir., 1940, 110 F.2d 157.

The argument made by the Commissioner that the Tax Court's decision has the effect of "distorting income" and "violates the fundamental rule that items of income and deductions should be accounted for on an annual accounting basis" is not persuasive here. Rather, we are of the impression that the Tax Court realistically decided the fact question as was within its province and has properly applied the law.

The Commissioner raised another point, namely, that assuming the $50,000 payment was for the dual purpose of "consideration for extension of the agreement and as a payment on account of the purchase price should the option be exercised", as held by the Tax Court, it erred in not determining what portion of the payment should be allocated to each purpose. Aside from the fact that the contention was not raised before the Tax Court it is without merit. The payment of $50,000 was properly held to be a credit upon the purchase price of $350,-000 and was not susceptible of allocation as between that purpose and keeping the option open.

We cannot say after a review of the record before the Tax Court, its findings of fact and discussion of the applicable law that it has erred as a matter of law or that the facts it found are so clearly erroneous as to warrant reversal. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746; C. I. R. v. Penn Athletic Club Building, 3 Cir., 1949, 176 F.2d 939, 943; 26 U.S.C.A. § 7482; Fed.Rules Civ. Proc. rule 52(a), 28 U.S.C.A.

The decision of the Tax Court will be affirmed.