**ANGELUS FUNERAL HOME,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REV-**
**ENUE, Respondent.**

No. 22118-A.

United States Court of Appeals
Ninth Circuit.

Feb. 10, 1969.

Rehearing Denied Feb. 27, 1969.

Leo Branton, Jr. (argued), William B. Murrish, Los Angeles, Cal., for appellant.

Gilbert E. Andrews, Jr., (argued), Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Bennet N. Hollander, Attorneys, Dept. of Justice, Washington, D. C., for appellee.

Before DUNIWAY and ELY, Circuit Judges, and TAYLOR,* District Judge.

DUNIWAY, Circuit Judge:

■ Taxpayer-Petitioner Angelus Funeral Home seeks review of a decision of the Tax Court, 47 T.C. 391 (1967), upholding the Commissioner's determination of certain income tax deficiencies against it for the year 1961. The sole question raised is whether Angelus must treat as income in the year of receipt payments made to it pursuant to a "pre-need funeral plan arrangement." The Tax Court held that it must. We affirm.

---

* Honorable Fred M. Taylor, United States District Judge for the District of Idaho, sitting by designation.

Angelus is a California corporation engaged in the business of providing funeral and burial services. It files its income tax returns on a calendar year, accrual basis. As a part of its business operations during the years 1954 and continuing through 1961, Angelus entered into written contracts with individuals. Each agreement, called a "Pre-Need Funeral Plan Agreement", provided for payment by the individual of a small down payment at the signing of the contract, and for voluntary payments of additional small amounts each month until a set sum was reached. Angelus agreed that when the individual died it would apply the total amount paid toward the cost of the individual's funeral. If the individual died at a place where Angelus could not perform its services, Angelus was to transfer the entire sum collected by it to a reputable funeral home which would provide the service.

During the years before and including the first months of 1961, Angelus used a form of agreement which provided:

4. The Parties agree that all sums paid by Applicant to ANGELUS shall be held by ANGELUS in irrevocable trust for the uses and purposes herein set forth. * * *

5. ANGELUS agrees that it will deposit all sums paid to it under this Agreement in a bank, trust company or savings and loan association and that it will not thereafter withdraw such sums, or any portion thereof, except for the uses and purposes herein set forth; provided that ANGELUS may at its discretion withdraw such sums for the purpose of redeposit in some other bank, trust company or savings and loan association.

Accordingly, Angelus could withdraw the funds only upon proof of the death of the individual, and then could use the funds only to provide funeral services. The interest earned on the deposited money accrued to Angelus as a fee for handling and accounting for the money.

While Angelus reported the interest received from the savings accounts as income, it did not reflect the amounts paid to it under the agreements as income in the year in which the payments were received. Rather, it reported income from the contractual payments only when it was required to fulfill the contractual obligations.

Angelus changed its agreement in September of 1961. The new agreement was similar to the prior form, including the language of paragraph 4, quoted above, except that it provided that:

5. ANGELUS may, at its option (a) deposit all or any portion of the sums paid to it under this Agreement in one or more banks, trust companies or savings and loan associations, or (b) at any time before or after such deposit thereof, use all or any portion of such sums as collateral or payment for (i) the costs of any capital improvement to then existing mortuary facilities belonging to ANGELUS, and (ii) the acquisition and improvement of real property.

As consideration for the right to use the payments in the manner provided, Angelus agreed to pay the contracting individual, at the end of each year, ten percent of the funds paid by him to Angelus during that year. Some individuals who had signed the older agreements converted them to the new type in order to receive the ten percent payment.

The Tax Court found that Angelus was a "true trustee" under the older form of agreement, and that it had no right to use the money paid by the contracting individuals. It held that Angelus was not taxable in the year of receipt on the payments collected under these agreements. This decision is not now questioned by the Commissioner. The Tax Court, however, found that the form of agreement adopted by Angelus in September of 1961 gave Angelus extensive rights to the payments and thereby destroyed the trust arrangement between the parties. It held that these payments were taxable as received by Angelus. Only Angelus now appeals.

In assessing the 1961 deficiency, the Commissioner did not rely, and he does not now rely, on the power given to him under 26 U.S.C. § 446(b) to require a taxpayer to compute taxable income under a method of accounting that, in the Commissioner's opinion, truly reflects income. Nor does Angelus assert that its "method of accounting" (26 U.S.C. § 446(a)) is correct and should therefore be followed. In short, this case is not an accounting case.

Angelus makes two claims: (1) that the payments received under the 1961 agreement were received by it in trust, and were therefore not income to it, and (2) that even if the payments were not received in trust, they were analogous to certain other types of advance payments that have been held not taxable when received, and that the payments received should therefore be held non-taxable as being, in substance, borrowed money.

### 1. The trust claim.

■ As a general proposition, payments received by a trustee expressly and solely for the benefit of another are not income to the trustee in his individual capacity. Healy v. Commissioner, 1953, 345 U.S. 278, 282, 73 S.Ct. 671, 97 L.Ed. 1007. The Commissioner argues that the 1961 pre-need agreements set up a "trust facade" and questions the effectiveness of the 1961 agreements to constitute a trust. But questions of trust validity are not before us in this tax case. This is not a situation in which no funds were paid into the "trust," or where the designated trust funds were commingled with a trustee's general accounts.[1] Rather, our task is to determine whether the economic benefit to Angelus as trustee is such that Angelus should be taxable on receipt of the payments, notwithstanding whatever power the beneficiaries may have to enforce the trust terms under state law. Gracelawn Memorial Park v. United States, 3 Cir., 1958, 260 F.2d 328, 332.

Not every receipt of benefits by a trustee subjects him to taxation on payments to the trust. Trustees receive fees for managing trusts without fear of taxation except as to the fee itself. The interest from the pre-need funds which Angelus received as a fee for management and collection services falls into the latter category. Also, a line of cases involving cemetery maintenance or perpetual care trusts recognizes that while the primary beneficiaries are the lot or niche purchasers, the cemetery also benefits from good maintenance of its premises; nevertheless, if the payments into the trust fund cannot be used for the corporate purposes of the trustee cemetery, they are shielded from taxation despite the incidental benefit to the cemetery.[2]

But in contrast to the perpetual care trust cases, cemetery owners seeking exemption from taxation for payments into trusts for future capital improvements have had very tough sledding indeed. The court in Mount Vernon Gardens, Inc. v. Commissioner, 6 Cir., 1962, 298 F.2d 712, summed up the cemetery owner's problem as follows:

"But the creation of a trust into which a portion of the purchase price is paid is not in and of itself sufficient to prevent the trust money from being treated as income. * * * [T]he decisive feature in each case is the terms and provisions of the particular trust involved. The questions of control by, and inurement to the benefit of, the taxpayer, are of prime im-

1. Parkchester Beach Club Corp. v. Commissioner, 2 Cir., 1964, 335 F.2d 478, 480; Acacia Park Cemetery Ass'n v. Commissioner, 7 Cir., 1933, 67 F.2d 700.

2. Commissioner v. Cedar Park Cemetery Ass'n, 7 Cir., 1950, 183 F.2d 553; Portland Cremation Ass'n v. Commissioner, 9 Cir., 1929, 31 F.2d 843; Green Lawn Memorial Park, Inc. v. McDonald, M.D. Pa., 1958, 164 F.Supp. 438, 441, affirmed 3 Cir., 1959, 262 F.2d 588; American Cemetery Co. v. United States, D.Kan., 1928, 28 F.2d 918; Troost Avenue Cemetery Co. v. United States, W.D.Mo., 1927, 21 F.2d 194; cf. Oak Woods Cemetery Ass'n v. United States, 7 Cir., 1965, 345 F.2d 361; Monte Vista Burial Park, Inc. v. United States, 6 Cir., 1965, 340 F.2d 595.

portance. In [two prior] * * * cases the Court was of the opinion that the trust funds were available under the terms of the trust to promote future capital improvements in the taxpayer's property, was for the taxpayer's benefit, and accordingly, was taxable income. * * *" (298 F.2d 716.)

The portion of the cemetery lot purchase price in *Mount Vernon* which was allocable to the "Development Trust Fund" was found to be a part of the cemetery's taxable income.[3] The capital improvement trust cases are applicable by analogy to the facts at hand. The 1961 form of Angelus' pre-need agreement gave Angelus the power to use the funds whenever it wished, subject only to limitations of purpose, i. e., land acquisition or improvement of mortuary facilities. These purposes would benefit Angelus, not the agreeing individuals who are beneficiaries under the trusts. Further, all of the trust funds are subject to Angelus' power. Thus, even assuming that an equity court would enforce the trust terms, the absolute power to benefit itself inhering in Angelus' position as trustee makes it liable for taxation on receipt of the pre-need payments. The trust permits Angelus to benefit itself more than incidentally, and therefore the trust does not operate to shield Angelus from taxation until Angelus acquires a completely unfettered control over the pre-need payments.

Our decision in Portland Cremation Ass'n v. Commissioner, 9 Cir., 1929, 31 F.2d 843, does not hold otherwise. There a trust was inferred from sale of cemetery niches with an accompanying covenant that a permanent fund would be established that could only be used for maintenance purposes. The court found that purchasers could invoke equitable remedies to prevent diversion of the fund to the trustee cemetery for corporate purposes. In the present case, however, the instrument creating the trust grants specific powers to the trustee to use the funds for its own purposes, and in an action to enforce the trust we presume that a court would enforce these grants as it would any other term of the trust.

2. *The "borrowed money" analogy.*

Angelus argues that three lines of decisions support its claim that the payments in question are not income when received, but are in the nature of borrowings. Whether the lender is the individuals who pay or the trust is not made clear. But in any event we do not find these authorities persuasive.

The first line of cases deals with deposits by a tenant of money to be held by a landlord as security for the tenant's performance of a lease.[4] The analogy is not persuasive. The prospective decedents certainly did not pay the money to Angelus to secure their own performance of anything, even their obligation to die. That obligation was scarcely owing to Angelus; we need not attempt to decide to what power, if any, it was owed.

The second line of cases deals with moneys paid to sellers on account of the price of goods to be delivered at a later date. One of them, Consolidated-Hammer Dry Plate & Film Co. v. Commissioner, 7 Cir., 1963, 317 F.2d 829, held that advance payments by the government to a small manufacturer-seller for the manufacture and sale of a large custom-made camera had the attributes of a financing arrangement in' the nature of a loan. We do not quarrel with the decision. But we find it so different in

---

3. Like results have been reached on similar facts in Jefferson Memorial Gardens, Inc. v. Commissioner, 5 Cir., 1968, 390 F.2d 161, 167; Sherwood Memorial Gardens, Inc. v. Commissioner, 7 Cir., 1965, 350 F.2d 225; Gracelawn Memorial Park, Inc. v. United States, 3 Cir., 1958, 260 F.2d 328; National Memorial Park v. Commissioner, 4 Cir., 1944, 145 F.2d 1008.

4. Clinton Hotel Realty Corp. v. Commissioner, 5 Cir., 1942, 128 F.2d 968 is principally relied upon. Also cited are Commissioner v. Riss, 8 Cir., 1967, 374 F.2d 161; Zaconick v. McKee, 5 Cir., 1962, 310 F.2d 12 (bankruptcy proceeding); Warren Service Corp. v. Commissioner, 2 Cir., 1940, 110 F.2d 723.

its facts as not to be analogous. Summit Coal Co., 1930, 18 B.T.A. 983, and Bremerton-Tacoma Stages, Inc. v. Squire, W.D.Wash., 1951, 96 F.Supp. 718, are similar. Compare Van Wagoner v. United States, 5 Cir., 1966, 368 F. 2d .95; Astor Holding Co. v. Commissioner, 5 Cir., 1943, 135 F.2d 47, which seem to us more closely analogous to the present case.

Also relied upon are cases dealing with sales of goods such as Veenstra & DeHaan Coal Co., 1948, 11 T.C. 964, or of cemetery lots in areas not yet developed, Woodlawn Park Cemetery Co., 1951, 16 T.C. 1067. Here, however, Angelus' obligation was to furnish funeral services at a future time.[5] Under these circumstances, we think that the reasoning of the Supreme Court in Schlude v. Commissioner, 1963, 372 U.S. 128, 83 S. Ct. 601, 9 L.Ed.2d 633, is applicable here. See also American Automobile Ass'n v. United States, 1961, 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109, Automobile Club of Michigan v. Commissioner, 1957, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746. It is true that those cases involved the power of the Commissioner under 26 U.S.C. § 446(b), while that power is not in issue here. But the reasons there given in support of the exercise of that power are here persuasive. Cf. Artnell Co. v. Commissioner, 7 Cir., 1968, 400 F.2d 981.

The third line of cases involves payments by a prospective buyer for an option to be applied to the price if the option be later exercised.[6] Those cases, however, involved a different problem. If the option is allowed to lapse, the money becomes ordinary income to the optionor; if the option is exercised, the money is received as part of the price of a capital asset, taxable, if at all, as capital gain. The taxpayer (optionor-seller) cannot know which type of income he

has when he receives the payments. No such uncertainty as to the character of the money received is here involved.

We hold that the payments here involved were neither loans nor sufficiently analogous to loans to be non-taxable when received.

Affirmed.

---

5. Angelus refers to an obligation to sell a casket, but that obligation is contingent upon payment of the full cost of the "funeral services," and the contract refers to Angelus' obligation to "use," not to "sell" a casket.

6. Kitchin v. Commissioner, 4 Cir., 1965, 340 F.2d 895; Commissioner v. Dill Co., 3 Cir., 1961, 294 F.2d 291; Virginia Iron Coal & Coke Co. v. Commissioner, 4 Cir., 1938, 99 F.2d 919.