ANTHONY D. MIELE AND MATILDA F. MIELE, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

PATRICK H. FIERRO AND EVELYN FIERRO, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6228–75, 6230–75.     Filed May 9, 1979.

*Patrick H. Fierro* and Anthony D. Miele, pro se.
*Alan E. Cobb,* for the respondent.

WILES, *Judge:* Respondent determined the following deficiencies in petitioners' income taxes:

| Docket No. | Petitioner | Calendar year | Deficiency |
|---|---|---|---|
| 6228–75 | Anthony D. Miele and Matilda F. Miele ...... | 1971 | $298 |
| | | 1972 | 8,968 |
| 6230–75 | Patrick H. Fierro and Evelyn Fierro ......... | 1971 | 19,989 |
| | | 1972 | 25,571 |

After concessions, the three remaining issues are:

(1) Whether petitioners' law firm, which utilizes a cash receipts and disbursements method of accounting, may defer recognition of client advances from 1972 to 1973 where the advances were received and held, in part, in a special bank account in 1972 and transferred to its general account in 1973;

(2) Whether the amount of $23,572, excluded from the law firm's income in 1971 and not included by respondent in the

firm's 1972 income as an amount received in 1972, should be taken into account under sections 481(a)[1] and 481(b)(1) in computing the law firm's gross income for 1972; and

(3) Whether petitioner Fierro suffered a business bad debt in 1971.

### FINDINGS OF FACT

Some facts were stipulated and are found accordingly.

Patrick H. Fierro (hereinafter Fierro) and Evelyn Fierro, husband and wife, and Anthony D. Miele (hereinafter Miele) and Matilda F. Miele, husband and wife, resided in Williamsport, Pa., when they timely filed their 1971 and 1972 Federal income tax returns and when they filed their petitions in this case.

### *Issues 1 and 2. Partnership Income Adjustments*

Fierro and Miele, attorneys, were the sole practitioners in their own law partnership in 1971 and 1972. They shared partnership profits on a two-thirds and one-third basis, respectively.

Petitioners maintained their books and filed their Federal income tax returns under the calendar year cash receipts and disbursements method of accounting. The law firm maintained its partnership books and filed its Federal partnership income tax returns under the calendar year cash receipts and disbursements method of accounting, except that it included in gross income only that portion of client advances held in a special bank account which were actually transferred to its general partnership account.

In compliance with Pennsylvania's Code of Professional Responsibility, the law firm preserved the identity of their client's funds and property through segregation and accounting measures. First, the law firm transferred all client advances, including advances for both future client costs and future legal services, to the Fierro and Miele Trustee Account (hereinafter trustee account). Second, the law firm provided an accounting of each client's funds by maintaining a ledger card reflecting all client transactions. When a case was closed, the firm would transfer the earned portion of the prepaid legal fees held in the

---

[1]Statutory references are to the Internal Revenue Code of 1954, as in effect for the years in issue.

trustee account to the general partnership account; the unearned portion was refunded to the client.

The law firm, operating under a cash receipts and disbursements method of accounting, would include the prepaid legal fees in income only when the funds were transferred to its general account. For administrative purposes, the firm would transfer funds from the trustee account only about four times a year, and it generally never made any transfers in November or December. Consequently, fees were not always included in income in the year earned and therefore otherwise available to the firm. In fact, $35,623.75 of the $68,199 held in the trustee account at the end of 1972 was earned and available to the firm in 1972 but not transferred to the general account, and not included in income, until 1973. In 1972, the trustee account had a beginning balance of $23,572, which was not included in the firm's 1971 gross income, and an ending balance of $68,199; $35,623.75 of that ending balance was earned in 1972 and the remaining balance was earned in 1973. In addition, the law firm had $4,337 in client advances on hand at the end of 1972 which had not yet been deposited in the trustee account; $2,000 of this amount specifically belonged to a client on the settlement of a case.

Respondent changed the law firm's method of accounting for client advances by placing it on a strict cash receipts and disbursements method. This created a three-part adjustment. First, respondent increased the firm's 1972 gross income by the difference between the 1972 ending and opening balances in the trustee account, an amount representing the amount of client advances received in 1972. Second, under section 481, respondent increased the firm's 1972 gross income by the 1972 opening balance in the trustee account. Third, respondent increased the firm's 1972 gross income by the amount of client funds received but not yet deposited less $2,000, the amount belonging to a client. This calculation is reflected as follows:

(1) Amount received in 1972:
Trustee account 12/31/72 balance .......... $68,199
Trustee account 12/31/72 balance .......... 23,572        $44,627

(2) Trustee account 12/31/71 balance ..................................... 23,572
(sec. 481 adjustment)

| | | | |
|---|---|---|---|
| (3) Undeposited income received in 1972...... | 4,337 | | |
| Less: Respondent's concession as to clients' funds........................ | 2,000 | | 2,337 |
| Respondent's increase in income........................................... | | | 70,536 |

Based upon this adjustment, respondent increased Fierro's 1972 taxable income by $47,024, his two-thirds partnership share, and increased Miele's 1972 taxable income by $23,512, his one-third partnership share.

### Issue 3. Fierro Bad Debt

In May 1969, Elijah Pringle, then an employee of Frank Hayes Pontiac, Inc., of Williamsport, Pa., approached Fierro with a business proposition to finance Pringle's acquisition of the Hayes Pontiac dealership. On October 6, 1969, following negotiations with Fierro, Pringle executed an agreement to purchase all the stock of Frank Hayes Pontiac, Inc. Fierro, a silent investing partner with Pringle, was not consulted in the actual signing of this agreement. After Fierro had reviewed the document, Pringle executed a supplemental agreement with Frank Hayes Pontiac, Inc., pursuant to which Fierro and Pringle placed $62,500 in an escrow account in their names and agreed to give the sellers a joint note for $22,500. Fierro contributed $42,500 of the $62,500 to the escrow account and Pringle contributed $20,000.

On March 12, 1970, Fierro granted Pringle an option to purchase his interest in the business in 7 years for $85,000. The option grant was required by General Motors Corp. who would not grant Pringle the right to sell Pontiacs without Fierro's agreement to terminate his interest in no longer than 7 years. General Motors wanted Fierro out of the dealership since he intended to operate only as an investor taking no active role in the business.

Following the option agreement, Pringle was granted the right to sell Pontiacs. The dealership was operated under the name of Pringle Pontiac, Inc.; 400 shares of stock were issued to both Pringle and Fierro.

An undisclosed tax liability of Frank Hayes Pontiac, Inc., discovered in May 1970, precipitated a Federal tax levy on Pringle Pontiac's corporate bank account. To obtain working capital, Pringle sought an SBA loan which was denied on the ground that a then-current stockholder, Fierro, was financially

able to assist Pringle. Pringle could qualify for the loan only if Fierro was no longer a stockholder. To allow Pringle to obtain the SBA loan, Fierro granted Pringle the following option on June 9, 1970:

PATRICK H. FIERRO gives to ELIJAH PRINGLE, III, the option to purchase all of the Fierro's FRANK HAYES PONTIAC, INC. stock for the sum of $42,500.00; this sum to be deferred until the S.B.A. loan is first repaid. This option is granted on Pringle's representation that this is required by the S.B.A. in order that he may obtain a loan from the S.B.A.

Pringle exercised this option and, on June 30, 1970, Fierro transferred his 400 shares to Pringle. Fierro did not report the sale of his stock in 1970. Pringle obtained the SBA loan but in October 1971, the business still failed. Pringle never repaid the SBA loan or paid Fierro for the stock.

Fierro deducted the $42,500 deferred purchase price as a business bad debt in 1971. Respondent allowed only a $29,473 long-term capital loss.

OPINION

*Issues 1 and 2. Partnership Income Adjustments*

We must first decide how petitioners' law firm must account for client advances which, in turn, requires us to determine in what year they are taxable. The timing of taxation of gross income is governed by sections 441 through 482.

Petitioners argue, in essence, that their law firm utilizes the cash method of accounting for income and expenses. As such, they argue that the law firm is not taxable on client advances until received, which is when the funds are transferred from the trustee account to the general partnership account. Secs. 1.446–1(c)(1)(i) and 1.451–1(a), Income Tax Regs. Respondent argues that the client advances are merely prepaid legal fees and are taxable in full when received by the firm regardless of whether they are subsequently transferred to the trustee account. We cannot entirely agree with either party.

Respondent's argument with regard to the first and third portions of his adjustment is that the firm must include in income all prepaid fees actually received in 1972, $44,627 on deposit in the trustee account and $2,337 on hand. He cites *Schlude v. Commissioner*, 372 U.S. 128 (1963); *American Automobile Association v. United States*, 367 U.S. 687 (1961); and

*Automobile Club of Michigan v. Commissioner*, 353 U.S. 180 (1957), for the proposition that prepaid service income is taxable in the year received even though the services are to be performed in the future. We do not question the vitality of the cases cited by respondent, only their applicability to the facts of this case.

In each of the three cases cited, the Supreme Court treated the accrual method taxpayers as taxable on prepaid income when received. The effect of the holding was to treat an accrual method taxpayer as a cash method taxpayer with regard to prepaid income—taxable on receipt. *Gunderson Bros. Engineering Corp. v. Commissioner*, 42 T.C. 419, 433 (1964). But the law firm in this case is already a cash method taxpayer and admittedly taxable on income when received. The narrow issue presented here is whether the law firm was in receipt of income when the prepaid legal fees were received by it. This in turn depends upon whether the firm received the fees under a claim of right and without restriction as to their disposition. *North American Oil Consolidated v. Burnet*, 286 U.S. 417, 424 (1932).

DR 9–102(A)[2] of the Pennsylvania Code of Professional Responsibility requires the law firm to transfer all client advances received to a special segregated bank account. Moreover, the funds so deposited and segregated may not be commingled with funds belonging to the lawyer or law firm; the firm must maintain records and account to the client for all transactions concerning the funds; and the firm may withdraw only the undisputed amount from the fund when actually due. Violation of the minimum standards set forth in the Disciplinary Rule subjects the firm and its members to disciplinary action.

---

[2]DR 9–102. Preserving Identity of Funds and Property of a Client

(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

(1) Funds reasonably sufficient to pay bank charges may be deposited therein.

(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

(B) A lawyer shall:

(1) Promptly notify a client of the receipt of his funds, securities, or other properties.

(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

These facts clearly indicate that the prepaid legal fees received by the firm are to be treated as owned by the client until an undisputed amount is due the firm. Under these circumstances, we view the law firm as a mere conduit for passing the client advances to the trustee account. See *Seven-Up Co. v. Commissioner*, 14 T.C. 965, 977 (1950); *Angelus Funeral Home v. Commissioner*, 47 T.C. 391 (1967), affd. 407 F.2d 210 (9th Cir. 1969). Moreover, the prohibition against commingling these funds with the law firm's and restrictions upon use until an undisputed amount is due clearly indicate the firm did not receive these funds under a claim of right and without substantial restriction as to disposition. *North American Oil Consolidated v. Burnet, supra.* Accordingly, we hold that the law firm is not in receipt of income when the payments were actually received. But this is not the end of the matter. Even though the law firm is not taxable on receipt of the payments from the clients, it may be in constructive receipt of amounts held in the trustee account at the end of the year.

The doctrine of constructive receipt requires taxation of income which is subject to the taxpayer's unfettered command and which he is free to enjoy at his own option even though he chooses not to. *Corliss v. Bowers*, 281 U.S. 376, 378 (1930). Income is not constructively received, however, if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. Sec. 1.451–2, Income Tax Regs. Thus, we must decide whether the funds held in the trustee account are subject to substantial limitations or restrictions which bar the application of constructive receipt doctrine. This, in turn, depends upon when the funds are earned.

DR 9–102(A)(2) provides that client advances belonging solely to the client must be deposited in a segregated bank account, but when the amount becomes due, the law firm may withdraw it. Client advances should be kept separate from the law firm's funds until such time that the firm has an undisputed right to those funds, when the funds are earned. Until the funds are earned, the firm's control of their receipt is subject to a substantial limitation; the firm cannot commingle them with its own funds and use them for its own personal purposes. Consequently, the firm is not free to enjoy the use of the funds until earned. *Corliss v. Bowers, supra.*

Fierro testified that $35,623.75 of the 1972 ending balance in

the trustee account was earned in 1972 but not included in income until 1973, the year transferred to the law firm's general account. We find the law firm constructively received this amount in 1972. Clearly, all the events defining the firm's right to this amount transpired in 1972 even though, for administrative purposes, it chose not to exercise the right until 1973. Sec. 1.451–2(a), Income Tax Regs. Further, respondent determined that $2,337 of client advances on hand at the end of 1972 but not yet deposited to the trustee account was income in 1972. Since petitioners failed to present any evidence that this entire portion was not earned in 1972, we find that they constructively received this amount in 1972. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Accordingly, with regard to the first and third element of respondent's adjustment, and on the basis of this record, we find the law firm's 1972 taxable income is increased by $37,960.75 ($35,623.75 + $2,337.00), the amount earned and constructively received in 1972.

Contrary to our finding, petitioners argue they should be allowed to continue their method of accounting for the funds in the trustee account since they have consistently used it. It is well settled that a cash method taxpayer may not account for his expenses and part of his income on the cash method and the remaining portion of his income on some hybrid method. Sec. 1.446–1(c)(1)(iv)(a), Income Tax Regs.; *Massachusetts Mut. Life Ins. Co. v. United States*, 288 U.S. 269, 273–274 (1933). The fact remains that petitioners and their law firm chose the cash receipts and disbursements method of accounting but improperly applied that method in only including in income the amount actually transferred from the trustee account to its general account. An improper but consistent application of their accounting method will not save petitioners' error.

The second issue is whether the amount of $23,572, excluded from the law firm's income in 1971, should be taken into account under sections 481(a) and 481(b)(1) in computing the law firm's gross income for 1972. Respondent did not include this item in the firm's 1972 income under the cash receipts and disbursements method of accounting since it was not received in 1972. Since petitioners do not dispute respondent's actual computation under section 481(b)(1), we need focus only on the contested application of section 481(a).

Section 446(a) states the general rule that taxable income is to be computed under the method of accounting the taxpayer regularly utilizes to compute his income in keeping his books. Section 446(b) states an exception to this rule in that if the method used does not clearly reflect income, respondent is authorized to compute the taxable income under such method as, in his opinion, does clearly reflect income. Section 446(c) generally outlines permissible methods of accounting—including the cash receipts and disbursements method.

Petitioners contend only that it is unfair to allow respondent to change the law firm's method of accounting which has been consistently used and tacitly approved through prior audits. Petitioners' arguments are without merit as discussed above. The regulations provide that a change in method of accounting includes a change in the treatment of any material item which is any item involving the proper time for inclusion in income. Sec. 1.446–1(e)(2)(ii)(a), Income Tax Regs. Respondent's change in the law firm's method of accounting for amounts held in the trustee account focused on accelerating the timing of income inclusion to the year earned—not transferred. As a result, we sustain respondent's application of section 481 to this case. See *Connors, Inc. v. Commissioner*, 71 T.C. 913 (1979). Moreover, since petitioners failed to present any evidence on what portion of the $23,572 was earned in 1971, we find the entire amount was so earned and that the entire amount is properly included in the law firm's 1972 income as a result of section 481.

Accordingly, on the basis of the record before us, we find that the law firm's 1972 gross income is to be increased by $61,532.75 ($35,623.75 + $2,337.00 + $23,572.00) which increases the petitioners' 1972 gross income by their respective share of profits.

### Issue 3. Fierro Bad Debt

In 1971, Fierro took a bad debt deduction when the collapse and termination of Pringle's business made it impossible for Pringle to liquidate his 1970 stock purchase debt of $42,500 to Fierro. Fierro contends this event entitled him to a $42,500 business bad debt in 1971 since he invested in Pringle's business in order to obtain significant future legal fees. Respondent does not question that Fierro suffered a deductible loss in 1971, only the amount and character thereof. He allows Fierro only a

$29,473 long-term capital loss deduction in 1971. Respondent contends that Fierro's 1970 stock transaction with Pringle constituted a conditional sale; that the condition of the sale, prior payment of an SBA loan, failed in 1971; that Fierro in substance retained his stock until 1971 when it became worthless; and that he is therefore entitled to only a capital loss from worthless securities under section 165(g). In contesting only the amount and character of the loss in 1971, the parties have overlooked a point basic to their dispute—the proper year of the deduction. We believe the timing of Fierro's loss deduction, regardless of amount and character, is governed by the 1970 stock sale, a point not sufficiently addressed by either party.

The record clearly establishes that Fierro made an unconditional sale of his stock to Pringle in 1970. On June 9, 1970, Fierro granted Pringle an option to purchase his stock so that Pringle could obtain an SBA loan. Pringle exercised the option and on June 30, 1970, Fierro transferred to him his 400 shares in Pringle Pontiac, Inc. Pringle then owned the shares and was therefore free to deal with them as his own. Pringle subsequently obtained the SBA loan. The SBA made the loan to Pringle apparently on the understanding that Fierro had sold his shares to Pringle since this was a condition precedent to their loan. Finally, the terms of the option contract on the sale of shares in no way qualify the sale. That contract qualifies only the payment of the purchase price on the prior repayment of the SBA loan. These factors lead us to conclude a final and unconditional stock sale occurred in 1970.

Our finding that the stock sale transpired in 1970 is not the end of the matter. The parties agreed the loss was deductible in 1971. We agree. The 1970 stock sale should be held open until 1971 and closed in that year when Pringle's promise to pay became worthless, a factor not disputed by either party. This results in a recognized loss in 1971 from a 1970 sale of stock. Sec. 1001(b); *McShain v. Commissioner*, 71 T.C. 998 (1979). We so find because the following factors lead us to conclude that Pringle's promise had no ascertainable fair market value in 1970 when received: Pringle's testimony that the corporation was essentially out of business in May of 1970 when the discovery of an undisclosed tax liability precipitated a Federal tax levy freezing the corporation's bank account; the stock sale occurring about a

month later; payment on the contract was contingent upon prior repayment of the SBA loan obtained after the sale; Pringle's promise to pay was not negotiable or freely transferable; and finally, even after the SBA loan was obtained, the business still failed in October 1971 and Pringle never paid either the SBA or Fierro.

Since Fierro received a promise to pay $42,500 in 1970 but realized and received nothing on that promise in 1971 when it became wholly worthless, his loss is measured by his $42,500 adjusted basis in the stock sold.[3] Sec. 1001(a), (b), and (c); sec. 1002; sec. 1011. Finally, Fierro's $42,500 loss in 1971 must be characterized as a long-term capital loss. Sec. 1221; sec. 1222(8). Fierro did not dispute respondent's determination that the effective holding period of his stock exceeded 6 months when sold and therefore respondent prevails on this point. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

Fierro's argument that he is entitled to a bad debt loss is wholly without merit. As discussed above, this case involves the loss on a sale of stock not the worthlessness of a bad debt. Accordingly, we find that Fierro sustained a $42,500 long-term capital loss in 1971.

We have considered the other arguments presented by the parties and find them either irrelevant or unpersuasive because of our holding.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

---

[3]As a footnote to his brief, respondent suggests the amount of Fierro's loss as set forth in the notice of deficiency at $29,473 is not in dispute. On the basis of the evidence in the record on this matter— including petitioner's 1971 tax return, petition, amended petition, uncontradicted testimony, and briefs—we are compelled to conclude that petitioner's 1971 basis in the stock is $42,500.