SECURITY ASSOCIATES AGENCY INSURANCE CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; WILLIAM H. YOUNG III AND CAROLE S. YOUNG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Security Associates Agency Ins. Corp. v. Commissioner
Docket Nos. 17254-85, 17255-85.
United States Tax Court
T.C. Memo 1987-317; 1987 Tax Ct. Memo LEXIS 317; 53 T.C.M. (CCH) 1239; T.C.M. (RIA) 87317; June 25, 1987. William F. Jones and Richard M. Tarby, for the petitioners. J. Darrel Knudtson, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined deficiencies in and additions to petitioners' income tax in the following amounts: SECURITY ASSOCIATES AGENCY INSURANCE CORP.,
Docket No. 17254-85
IRC 1954, Sections
Year
Deficiency
6651(a)
6653(a)(1)
6653(a)(2)
1980
120,005
5,936
6,470
1981
114,599
5,730
50% of int. on
114,599
WILLIAM H. YOUNG III and CAROLE S. YOUNG,
Docket No. 17255-85
1980
83,892
4,195
1981
90,396
4,520
50% of int. on
90,396
*319 After concession of many of the substantive issues on which the deficiency determination is based, and all of the additions to tax, several issues remain in dispute. The first is whether amounts received by Security Associates Agency Insurance Corporation from Jefferson National Life Insurance Company are to be treated, on their receipt by Security Associates, as taxable advances on commissions or as nontaxable loans. If the receipts are found to be taxable as advance commissions, we must decide whether a section 481, IRC 1954, adjustment is proper as to the year 1980. Also remaining for decision is whether Security Associates' expenses incurred in connection with the rental of a yacht are properly deductible by it as business expenses. If we find that the expenses are not properly deductible, we must determine whether William H. Young III may properly be charged with constructive dividends in respect of the yacht. Some of the facts have been stipulated. The stipulation of facts and attached exhibits, to the extent admissable, [1] are incorporated herein by reference. For convenience, the findings of fact and opinion are grouped together by the commissions and the yacht rental *320 issues. I. The Commissions.
Petitioner Security Associates Agency Insurance Corporation (hereinafter petitioner or Security Associates or the corporation or the agency) is a Maryland corporation which was incorporated in 1972. At the time it filed its petition in this case, its principal place of business was in Columbia, Maryland. It is wholly owned by petitioner William H. Young III (hereinafter Young), who is also its president. At the time they filed their petition in this case Young and his wife resided in Lake Park, Florida. Young has been in the insurance business *321 for many years, and in a number of recent years has acted as a general agent. [2] The commissions at issue all relate to policies issued by Jefferson National Life Insurance Company (Jefferson, Jefferson National, or the Company) and were based upon a contract dated March 22, 1973, [3] between Young personally and Jefferson, whereby Young became a general agent for Jefferson. The contract provided that, although it was otherwise not assignable, Young could "assign it from his individual name unto a corporation of which he is the principal owner and manager". *322 Jefferson apparently understood that Young intended to assign his commissions to his wholly owned corporation, and Young did subsequently assign to Security Associates his "full and complete rights to all Life Insurance Commissions" generated by him. Jefferson did not object to any such assignment, but it nevertheless continued to deal with Young individually, not with his agency, and its records (even the Forms 1099 filed with the IRS) reflect commissions paid to Young personally, not to Security Associates. The Commissioner has treated the commissions as taxable to Security Associates, rather than to Young individually, and the parties petitioner have not objected, challenging only whether or to what extent the commissions here in question were taxable at all as income in the years involved. In the circumstances, although we feel uneasy about doing so, we will consider the issue as presented to us, [4] and will assume that the amounts involved found to have been paid were paid and payable to Security Associates. *323 The commissions in controversy were first year commissions, and were fixed by the Jefferson contract to be 80 percent of first year premiums. The premiums on most, if not all, of the policies were payable on a monthly basis. The contract provided for the payment of the commissions at the applicable percentage only to the extent of "premiums actually received in cash by [Jefferson]". However, it was the practice of Jefferson to pay the full 80 percent commissions on the entire first year premium immediately upon its approval of an application for the policy, notwithstanding that it had not in fact received the full first year premium. Such advance commissions were received by Security Associates and retained by it under a claim of right without any restriction as to their use or disposition. Security Associates keeps its records on an accrual basis. On its income tax returns for 1980 and 1981, it included in income only those first year commissions that had been "earned" in those years, i.e., only that portion of the commissions that related to premiums that had in fact been paid to Jefferson. Not reported were the "unearned" first year commissions actually paid by Jefferson, *324 i.e., the commissions or portions thereof that were allocable to premiums that had not yet been received by Jefferson. The Forms 1099 issued by Jefferson showed amounts which included only the "earned" commissions and not the total commissions paid by it. In the notice of deficiency the Commissioner increased taxable income of Security Associates in the amounts of $148,149 and $88,425 for 1980 and 1981, respectively. He explained these adjustments as follows: Income received by you and treated as unearned until the following year is determined to be taxable to you in the year received. Therefore, taxable income is increased in the amount of $148,149 for 1980 and in the amount of $88,425 for 1981. The Commissioner obtained these two amounts from Line 17 of the balance sheets that were part of the returns of Security Associates for 1980 and 1981. Line 17 of the printed form of the balance sheets contained the printed words "Other current liabilities", but the word "ADVANCES" had been added by hand. As to the year 1980, the Commissioner treated $148,148.71 (which he rounded to $148,149) as income for that year, namely, the amount outstanding at the end of the year on Line *325 17 of the balance sheet. He did not subtract from that amount the corresponding figure of $72,041.17 for the beginning of the year. The difference between these two figures, $76,107.54 ($148,148.71 minus $72,041.17), represents the alleged net amount of "unearned" advance commissions actually paid by Jefferson during 1980 allocable to those portions of premiums on policies sold in 1980 that Jefferson had not in fact received during 1980. The $72,041.17 figure as of the beginning of the year represented "unearned" items or liabilities relating to prior years. To justify treating the opening balance as reflecting commissions to be taxed in 1980, the Commissioner contends that his action in this respect is an appropriate section 481 adjustment required as a result of a change in accounting method. As to the year 1981, the Commissioner's inclusion of $88,425 in taxable income is based solely upon increase in the Line 17 advances opening figure of $148,148.71 to the closing figure of $236,573.75. That $88,425 increase represents the alleged net amount of "unearned" advance commissions actually paid by Jefferson in 1981 in respect of portions of premiums on policies sold in 1981 that *326 had not yet been received by Jefferson in 1981. Security Associates does not dispute that some parts of the amounts received from Jefferson in 1980 and 1981 (i.e., those parts equal to net advance commissions paid by Jefferson in respect of unpaid premiums) were not reported as income on its respective returns for those years. However, it does contend that no "unearned" advance commissions actually received in respect of premiums unpaid during the respective years were taxable as income in the year received. Although the record is not clear in this respect, it would appear that Security Associates did in fact report such commissions as taxable income for the following year to the extent that the commissions were "earned" as a result of payment of the premiums to Jefferson in such following year. Security Associates also argues that the amounts of the advance commissions in controversy were in fact less than the amounts derived by the Commissioner from Line 17 of the balance sheets, and that, in any event, no section 481 adjustment is proper. We will consider each of these points separately. (a) Whether the advance commissions were taxable when received. In our judgment, *327 the amounts of advance commissions actually paid by Jefferson -- whatever those amounts may be -- constituted taxable income in the year of actual receipt. We so hold, notwithstanding that such commissions may have been theoretically "earned" in the subsequent year by payment of premiums to Jefferson, and notwithstanding that some part of the "unearned" commissions of the earlier year may not even thus have been "earned" in the subsequent year and may have to be returned or accounted for to Jefferson in some later year by reason of ultimate nonpayment of relevant premiums. At least two separate preliminary issues thus emerge. The first relates solely to the commissions "earned" in the subsequent year upon payment of the premiums to Jefferson. This is simply a when question, namely, when are the "unearned" commissions to be reported: the first year, when actually received, or the second year when they are "earned" or accrued. The second, is a whether question: do the commissions represent reportable taxable income at all in view of the fact they may have to be returned or otherwise accounted for to Jefferson should it later turn out that the relevant premiums had not been *328 paid. (i) Accrual.The answer to the first question is easy. To be sure, Security Associates uses an accrual system of accounting, and it could conceivably be argued that its right to that portion of the advance commissions allocable to the unpaid premiums does not accrue until such premiums are paid. However, it has been firmly established that an accrual basis taxpayer may be required "to include amounts in income no later than the time the payment thereof is received". Hagen Advertising Displays, Inc. v. Commissioner,47 T.C. 139, 148 (1966), affd. 407 F.2d 1105 (6th Cir. 1969). We stated the rule quite plainly in Automobile Club of New York, Inc. v. Commissioner,32 T.C. 906, 913 (1959), affd. 304 F.2d 781 (1962), as follows (32 T.C. at 913): An item of income cannot accrue for tax purposes after it has in fact been received subject to the unrestricted use of the taxpayer. Income may accrue prior to receipt, but not subsequent thereto. The principle has been recognized and followed in a variety of cases and situations. See, e.g., RCA Corp. v. United States,664 F.2d 881 (2d Cir. 1981) *329 (Prepaid income on service contracts); Mele v. Commissioner,61 T.C. 358, 365-367 (1973) (Prepaid interest); Farrara v. Commissioner,44 T.C. 189, 191 (1965) (Prepaid income from sale of merchandise).[5] Accordingly, there is no basis whatever for refusing to report commissions actually received in 1980 and 1981 merely because they relate to income that may be treated as "earned" or accrued in the year following receipt.
(ii) Claim of Right. Nor is there any valid basis for not reporting the commissions in 1980 and 1981 when received merely because they might have to be returned to Jefferson should it fail to receive the premiums involved in the following year. Such contingency requiring repayment does not deprive the payments of the commissions of their status as currently reportable income. The *330 advance commissions paid by Jefferson were received by Security Associates and retained by it under an undisputed claim of right completely without any restriction on their use or disposition. This is a classic case for application of the well known claim of right doctrine. The relevant principle has been stated many times. It was succinctly and comprehensively summarized some 28 or 29 years ago by Judge Wisdom in Estate of Whitaker v. Commissioner,259 F.2d 379, 382 (5th Cir. 1958), affg. 27 T.C. 399 (1956): [6]
The claim of right doctrine is firmly established in our tax law. If a taxpayer receives earnings under a claim of right, without restriction as to its use, it is taxable income in the taxable year when he receives the earnings. The principle applies even though in a later year he may be required to refund all or part of the money. It applies whether returns are on the cash or accrual basis. * * * [Footnote reference containing supporting discussion of Supreme Court cases omitted.] *331 We need not belabor the point, and petitioner hardly challenges it. Instead, it seeks to get around it, claiming that the advance commissions were not really commissions or earnings at all, but that they were merely "loans" from Jefferson. If they were in fact loans, then petitioner's position is unassailable, because the receipt of proceeds of a loan plainly does not represent taxable income. We now address that question. (iii) Loans. Notwithstanding evidence presented by petitioner, upon which we will comment shortly, we are satisfied that the advance ("unearned") commissions did not represent loans from Jefferson to Security Associates. If they were loans, one would necessarily expect some requirement for repayment. As far as we can tell from the record -- and petitioner has not shown otherwise -- the great bulk of the advance commissions that remained unearned or unaccrued at the end of the year of receipt in fact became earned or accrued in the following year when the remaining first year premiums were paid to Jefferson. Thus, as to such advance commissions there were no repayments of any kind of "loans" by Security Associates to Jefferson. The completion of payment *332 of first year premiums by the insured in Security Associates' second year merely resulted in changing the "unearned" classification of the advance commissions to "earned" commissions. In short, the theretofore "unaccrued" commissions became "earned" in petitioner's hands at that time during the second year. Since petitioner was an accrual basis taxpayer, those previously "unearned" commissions merely became "accrued" during the second year. But, as we have pointed out above, even an accrual basis taxpayer may not postpone reporting actual receipts beyond the time of such receipts until a later time when the taxpayer's right thereto "accrued". The advance commissions on policies upon which payment of first year premiums was completed in the second year plainly did not constitute loans. Petitioner gave no notes therefor, no interest was paid by petitioner or required of it in such circumstances. Petitioner made no "repayment" of any principal on any such alleged loans, but instead merely earned the commissions advanced. The advances were not loans but were income paid ahead of the time earned. Cf. Beaver v. Commissioner,55 T.C. 85, 91 (1970); Colombo v. Commissioner,T.C. Memo. 1975-162, 34 TCM 733, 44 P-H Memo T.C. par. 75,162. *333 This was nothing more than a matter of accrual accounting with consequences as described by us above in part (i) of this section of our opinion. A somewhat different situation is involved in the case of policies that lapsed or were cancelled prior to the end of their first year. There, petitioner would also have received the full first year commissions, but the portion thereof allocable to the unpaid premiums was thus never "earned" and had to be accounted for ultimately to Jefferson. However, the contract with Jefferson contained no requirement for repayment during its existence, which could conceivably continue for a long, indefinite period of years. And there is no dispute that the earliest point at which Jefferson could demand repayment of the unearned commissions was on the date of termination of the contract -- an event which would not occur until two years after written notice of termination was given. Only at that point did there come into being Jefferson's right to repayment, and it was only at that point that interest (at seven percent a year) would begin to accrue on the balance of those unearned commissions. In fact, notice of termination on July 7, 1988, was given *334 here by letter to Young dated July 1, 1986. Thus, it will be on July 7, 1988, that Jefferson's right to recover the unearned commissions together with interest from that date will arise. Prior thereto Jefferson had only an inchoate or conditional right to have the unearned commissions restored to it. Meanwhile, Security Associates used or commingled the unearned commissions with its other assets without any restriction as to their disposition. Unless the 1980 and 1981 commissions involved herein were received by it as the proceeds of a bona fide loan from Jefferson, they were plainly taxable when received, as pointed out above in part (ii) of this section of our opinion. This Court was faced with a like issue involving similar facts in George Blood Enterprises, Inc. v. Commissioner,T.C. Memo. 1976-102, 35 TCM 436, 45 P-H Memo T.C. par. 76,102. There, too, the full first year commissions were received in advance, notwithstanding that they had not yet been "earned" by payment of the full first year premiums. The Court noted that the advances would be repaid in full by crediting the amount of earned commissions against the "debt account" if the policy remained *335 in effect the first full premium period. There, too, the taxpayer argued that all the advance commissions were merely "loans". However, the Court held otherwise in the circumstances of that case, pointing out that there was no fixed date for repayment of any sum certain in respect of any of the advance commissions, and that the obligation was contingent in character. A like result was reached in McAllister v. Commissioner,417 F.2d 581 (9th Cir. 1969), affg. a Memorandum Opinion of this Court, and is also called for here. Cf. Brown v. Helvering,291 U.S. 193, 199 (1934) (involving general agent's contingent liability to repay commissions where policies were cancelled). In its effort to prove that the "unearned" advance commissions represented loans to Security Associates, petitioner presented a considerable amount of evidence relating largely to Young's background and his negotiations with Jefferson leading up to his being appointed a general agent for Jefferson. We found it unpersuasive. That evidence chronicled Young's history as a general agent for the Occidental Life Insurance Company, followed by his being a general agent for American *336 Investment Life and then for 12 years with Lafayette Life Insurance Company (Lafayette). By the mid-1960s, his agency produced more business for Lafayette than any other of Lafayette's agents. He desired to expand his business. He found, however, that if he tried to expand by acting as a general agent for other companies, Lafayette would stop advancing his commissions to him. Instead, it would pay him only those commissions that had been earned and it would offset against those earned commissions prior advances on unearned commissions that had been made to him and had not yet been repaid by him. Such course of action on the part of Lafayette would have substantially reduced Young's cash flow and hampered his ability to operate. Around 1967, Jefferson contacted petitioner to discuss a general agency agreement, but Young was not yet ready to enter into an agency agreement with it. When Jefferson contacted petitioner again in 1971, he had by then repaid Lafayette a large portion of the advances it had made to him and was then ready to consider entering into an agreement with Jefferson. Meetings were held in 1971 and 1972 to negotiate such an agreement. Jefferson initially became *337 interested in enlisting Young as a general agent because it understood that he was producing a large volume of profitable business for Lafayette. Jefferson anticipated that Young could increase Jefferson's business by one-third, and that the policies sold through Young's efforts were likely to be renewed at a relatively high rate. In negotiating an agency contract with Jefferson, Young was concerned with reaching an agreement under which he would not be subject to a cash shortage on termination of the contract. In other words, he did not want Jefferson to be able to offset against commissions he was earning or being advanced, any previously advanced commissions that were due to be repaid to the company as a result of lapses in policies written. In addition to this flexibility to terminate his contract with Jefferson, petitioner wanted cash in order to expand his business, control over his business and his clients, and a high rate of both first year and renewal commissions. He also wanted the renewal commissions to continue to be paid even after either his own death or the termination of his contract with Jefferson so long as the policies were renewed. In the initial negotiations *338 with Jefferson, Young requested that he receive a first year commission equal to 90 percent of first year premiums paid to it. He also asked for an agency "allowance" equal to one hundred percent of those premiums. The 90 percent first year commissions requested by Young would be earned by and paid to Young as the policyholder paid his monthly premiums to Jefferson. Thus, under the originally requested terms, Young would presumably be paid his commissions only as they were earned on a monthly basis, not in advance. In addition, Young asked for loans of $10,000 to $50,000 a month. Jefferson was anxious to get Young as a general agent, particularly since Young had a 13-year history of obtaining renewals at a rate of 85 percent in the fifth year after sale of the policy, substantially higher than the rate regarded as prevailing throughout the industry generally. Young was also ready to guarantee that at least 80 percent of the policies would be renewed after the first year. However, instead of the earned commissions and loan package that Young first requested, the parties finally agreed on a different compensation arrangement reflected in the March 22, 1973, contract that is now *339 before us. The compensation arrangement incorporated in the contract [7] between Jefferson and Young consisted of three major elements: first year commissions, an agency allowance or bonus, and renewal commissions. [8]
The first year commissions to which Young and Jefferson agreed were set at 80 percent of first year premiums, rather than the 90 percent that Young had initially requested. Although the contract required the 80 percent commission to be paid as a percentage of "premiums actually received in cash by Company", it nevertheless appears to have been clearly understood that the full first year commissions would be and in fact were paid in advance before the full first year premiums were *340 received in cash by Jefferson. It was in this context that Young did not insist that Jefferson also lend him a fixed sum monthly as he had originally requested. We have carefully reviewed the extensive evidence, some of the salient features of which were summarized above, and have concluded that the advance commissions were nothing more than advance commissions, not loans as argued by petitioner. To be sure, Young abandoned his request for periodic loans proposed by him in the earlier negotiations. Such loans were perceived by him as essential to the cash flow required to carry on his general agency business. But that is a far cry from concluding that the advance commissions were also loans, negotiated in lieu of the periodic loans previously sought by him. As we evaluate the evidence, the advance commissions merely gave Young the cash flow that he desired. They were, in a sense, the substitute for the loans that he had originally requested. But what he really sought was cash flow and the requested loans were merely a means to that end. He attained that end through the advance commissions instead of through loans. They constituted income when received and were not themselves *341 loans of any kind. In support of its position that the "unearned" advance commissions were loans and not taxable income, petitioner points to the fact that they were not included in the 1099s issued by Jefferson and that Jefferson did not deduct them on its own returns as current expenses. Accordingly, petitioner argues, Jefferson's action, which was contrary to Jefferson's own best interests, reinforces petitioner's treatment of the advance commissions as loans. The argument is faulty. The reason that Jefferson did not deduct such "unearned" advance commissions on its own return is explained by the fact that Jefferson understood (whether correctly or incorrectly) that as an accrual basis taxpayer it was not entitled to the deduction until its obligation to pay the commissions "accrued". This was made clear by the testimony of Jefferson's current vice president and controller. It hardly supports petitioner's claim that the advance commissions were regarded by the parties as "loans" made by Jefferson. Finally, even if the contract between Young and Jefferson could be construed to classify the advance commissions as loans to Young, they certainly were not loans to Security Associates, *342 which had no obligation whatever to Jefferson to "repay" any such "loans". Although the Commissioner has accepted the position of the parties that petitioner is accountable for the commissions assigned to it by Young, there is no showing that Jefferson ever assumed any of Young's obligations under the contract. Indeed, petitioner's understanding of its responsibilities in this respect is evidenced by a Resolution of its Board of Directors that "any indebtedness created by William H. Young, III's individual contracts being assigned to the Security Associates Agency shall be the sole responsibility of William H. Young, III". (b) Whether the Commissioner erred in determining the amounts of advance commissions for 1980 and 1981. As already noted above, the Commissioner's determination of deficiency was based on his treating the figures on Line 17 of petitioner's balance sheet as reflecting the advance commissions. The word "ADVANCES" had been added by hand as descriptive (at least in part) of that line. Petitioner does not dispute that there were substantial amounts of advance commissions in each of the years or that they appeared anywhere else in its balance sheet other than *343 on Line 17. But it does argue that the correct amounts of the advance commissions were less than those determined by the Commissioner. The burden of proof in this respect was upon petitioner, and, apart from the extent to which the Commissioner used the opening amount of advances at the start of 1980, we cannot find that it has been carried. The Commissioner does not argue that any part of the opening figure represents advances made in 1980, but seeks to support his use of the opening figure as a section 481 adjustment -- a matter that we will consider in the following section (c) of this opinion. The Commissioner's determination proceeded on the assumption that the respective increase from the opening to the closing figures on Line 17 for each of the years 1980 and 1981 was equal to the net amount of advance commissions paid by Jefferson in those respective years. As noted earlier in this opinion, those increases amounted to $76,107.54 for 1980 and $88,425 for 1981, or a total of $164,532.54. Petitioner does not disagree that the actual amount of advance commissions was included within those figures, but it contends that the total amount thereof was $139,825. Petitioner's *344 source for the $139,825 figure is an account analysis prepared by the vice president and controller of Jefferson. We were unpersuaded by that analysis. Not only did it not undertake to show what the advance commissions amounted to separately for 1980 and 1981, but even as to the aggregate of $139,825 for both years the underlying materials used for arriving at that figure were highly confusing. Those underlying materials were the year end "Agent's Commission Statements" for 1979 through 1981. The balance of advances used in the analysis for each year was apparently taken from a column on the Agent's Commission Statement which is headed "Net Balance This Month" and is roughly equal to the total of some 50 figures which appear in that column. While the total of that "Net Balance" column presumably represents Jefferson's record of Security Associates' debit balance, neither the components that made up this "Net Balance" nor the manner in which it was calculated are explained in the record. Moreover, still further confusion emerged from the testimony of the person who was petitioner's accountant during 1980 and 1981. He testified that the total cash received by Security Associates *345 exceeded the amounts of the "earned" commissions in those years. He explained that the method used to reconcile the difference between the cash received and the commissions earned was to identify all sources of cash received and then treat the excess cash as "commission advances". It was this "commission advances" figure that made up the Line 17 balance sheet entry relied upon by the Government. An accounting consultant hired by petitioner to review the returns for those years admitted that he did not reconcile the advances shown on the agency's return with the amount that Jefferson showed as a "debit" balance. He suggested that the excess funds categorized as "ADVANCES" could have been the personal funds of Young since Young apparently or allegedly did not carefully distinguish between his personal funds and those of Security Associates. But this conclusion was based on little more than speculation and does not establish that the Commissioner's determination with respect to the excess advances is incorrect. We are thoroughly dissatisfied with the explanations of this discrepancy. On the fuzzy record presented we certainly cannot conclude that petitioner has carried its burden *346 of proof, and we therefore accept as correct the Commissioner's use of the figures on the agency's balance sheets submitted with its tax returns. (c) The section 481 adjustment. In his determination of deficiency for 1980 the Commissioner included in income for that year the opening figure of $72,041.17 on Line 17 of petitioner's balance sheet. This figure obviously referred to items reflecting receipts by petitioner in pre-1980 years. The Commissioner's only asserted justification for including that $72,041.17 in petitioner's 1980 income was that it represented advance first-year commissions received prior to 1980 that had not yet been "earned" by the close of 1979 and therefore not reported by petitioner prior to 1980, with the consequence that unless it were included in 1980 income, it would escape taxation entirely, contrary to the requirements of section 481. For reasons about to be explained we hold for petitioner on this issue. Section 481(a)(2) in essence provides that where there is a change in accounting method there shall be taken into account those adjustments "determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated *347 or omitted". Moreover, section 1.481-1(a)(1), Income Tax Regs., provides that a change in method of accounting includes not only a change in the overall method but also "a change in the treatment of a material item". Here, petitioner used an accrual system of accounting, but failed to include in income advance commissions when received, reporting them only as they accrued. The Commissioner's determination, approved by us, required petitioner to report such items when received, not at some later time, notwithstanding that it was otherwise an accrual basis taxpayer. This was a change in the treatment of a material item within the meaning of the regulations promulgated under section 481. It changed the method for fixing the time when a material item of income would be reported. However, based on the record in this case, section 481 is inapplicable to the opening entry of $72,041.17 on Line 17 of petitioner's 1980 balance sheet. In the first place, there was convincing evidence that $35,000 of that amount represented seven bona fide loans of $5,000 each made by Jefferson in 1975 and 1976, wholly unrelated to advance commissions. There was no basis whatever for applying section *348 481 to that $35,000 component. As to the remaining $37,041.17 ($72,041.17 minus $35,000), most, if not all, of such remainder probably did relate to pre-1980 advance commissions that had not yet been "earned" by the end of 1979. However, section 481 would have no application here unless it were necessary to prevent an item of income from escaping taxation. But, to the extent that this $37,041.17 represented "unearned" 1979 advance commissions that were earned in 1980 upon payment of premiums to Jefferson, they were accrued in 1980 and reportable by petitioner under its prior method of accounting. And there is no suggestion that such amounts were therefore not already included in its reported gross income for 1980. To require it to be included again in its gross income would merely result in an unwarranted duplication. There still remains, however, what could probably be a relatively small amount of "unearned" advance commissions allocable to lapsed or cancelled policies. Those commissions would not be earned in 1980 and therefore were not reported by petitioner. However, as to such commissions, the crux of the matter rests not upon a question of accounting method -- a when *349 question --, but upon whether they were reportable or taxable at all - a whether question. In concluding that such advance commissions were taxable upon receipt we decided a whether question -- i.e., that such advance commissions actually received were taxable. That conclusion did not turn upon selecting one year as opposed to another as the proper time for accounting for such items. It had nothing to do with timing, and therefore cannot be the subject of a section 481 adjustment in respect of such advance commissions received prior to 1980. See Miele v. Commissioner,72 T.C. 284, 292 (1979); Connors, Inc. v. Commissioner,71 T.C. 913, 918 (1979); Schuster's Express, Inc. v. Commissioner,66 T.C. 588, 596-597 (1976), affd. 562 F.2d 39 (2d Cir. 1977). If the $37,041.17 component of the opening 1980 Line 17 item includes anything else besides advance commissions, there is no indication whatever that any such portion thereof would support a section 481 adjustment. II. The Yacht Expenses.
On June 18, 1976, Sunshine Cruises, Inc., was incorporated with Young as its sole owner. Later in that year, on *350 December 27, 1976, Sunshine Cruises filed an election to be treated as a small business corporation under Subchapter S. On June 21, 1976, Sunshine Cruises bought the "Mark II", a 58-foot fiberglass yacht for $224,538 and later improved it with equipment costing $94,869. The yacht had a master stateroom, a guest stateroom, crew quarters, a galley, and a salon that opened up to the aft deck. It was air conditioned and could accommodate eight overnight guests. At issue are the deductions taken by Security Associates in connection with the lease of this yacht. From its purchase in 1976 until the years at issue herein, with only one exception, the Mark II was leased exclusively to Security Associates. Nonetheless, in the years 1976 through 1979, Young and his family also used the yacht for personal purposes. It was then kept in Annapolis near Young's residence at that time. The yacht was reported as then used 65 percent for business and 35 percent for family and personal purposes. In 1979 Young learned that tax deductions for yachts which were used in the manner that the Mark II was used would be subject to stricter standards. He was advised to buy another boat for his own use *351 and to refrain from so using the Mark II, but to use it purely for business purposes. In 1979 Young bought a 23-foot Mako sport fishing boat for about $38,000. It was radically different from the Mark II. Young used it in his personal capacity and during breaks from the meetings held on the Mark II. In 1981 Young donated a "23' Mako" boat to "Florida Southern College Marine Research Services, Inc." Young or Sunshine Cruises also owned a 15 foot Boston Whaler. During the tax years, 1980 and 1981, the Mark II's home port was Ft. Lauderdale, Florida. Young at that time resided in Florida, and commuted to Maryland to attend to the affairs of petitioner and other business interests. He owned a condominium in Ft. Lauderdale about 90 feet from where the Mark II was moored, but his principal residence was about 45 miles away. Although it had a captain on board throughout the year, the Mark II was used only five times in 1980 and only six times in 1981, for between three and eight days each time. On each such occasion it would be used either in the Ft. Lauderdale waters or in the West Indies. In the latter case, the captain and a mate would bring the yacht the 180 miles from Ft. *352 Lauderdale to Nassau where it would pick up its passengers. The invited guests boarded the Mark II in Nassau and had paid their own way to Nassau. Occasionally, Young would travel with the crew on the trip to Nassau, but he would usually fly there. From Nassau, the Mark II and its passengers would generally travel either to Highborne Key or to Chub Cay. Each of these destinations was about 35 miles from Nassau. Each island was secluded and did not have the usual resort attractions. On each of the five or six trips taken on the Mark II in 1980 and 1981, the "business" guests Young brought aboard the boat for the meetings numbered one, two, or three. Those guests would generally bring their spouses on the trip. On only four of the five trips taken in 1980 and two of the six trips taken in 1981, meetings were held aboard the Mark II that related to Security Associates' insurance business. Agents of Security Associates were aboard on those insurance-related trips. Of the 10 or 11 agents and five other staff members the agency employed in those years, only six of the agents visited the boat. Of that six, Young's association with three was described. One agent (Chenworth) was the *353 supervisor of the other agents and had been an agent affiliated with Young since 1961, another (Corning) had been an agent affiliated with Young since 1960 or 1961, and the last (Waagbo) was during the years at issue a relatively new agent, but had been a secretary to Young since 1969. There was no indication or reason to believe that Young's relationship with the other three agents who were invited on the Mark II in 1980 and 1981 was not equally as long and familiar as was his association with Chenworth, Corning, and Waagbo. Of the four trips in 1980 and the two in 1981 on which the agents were invited on the Mark II, the purpose of the trips was described as training, and particularly, the development of a sales presentation. When an agent was brought aboard the vessel for this training he would either meet alone with Young, or he would meet with Young and one or two other agents, or he would meet with Young, a medical doctor, and sometimes one other agent. Two medical doctors were among the guests on the Mark II on some of the foregoing trips in the years at issue, although only one of them was aboard on any particular trip. Both doctors were described as "friends" of Young, *354 one since 1971 and the other "for a number of years". One was an obstetrician-gynecologist and the other was an anesthesiologist. The manner in which these doctors were able to instruct or train the agents on the Mark II in a way useful to the sale of insurance was not convincingly made clear. The role of the doctors was described as training the agents to better identify insurance risks and better evaluate the insurability and cost to insure prospective clients. However, it was not established that these doctors had any special knowledge of either the risks that Jefferson would agree to insure or the amounts the Company would charge to insure those various risks. During one of the two insurance related trips made in 1981, Young also had aboard the Mark II, Donald Hackett, who was then vice president and controller of Jefferson. The purpose of the meeting with Hackett was to discuss ways to better coordinate the operations and procedures of Security Associates. In addition to the trips on which insurance business was discussed, one other trip was taken in 1980 and four other trips were taken in 1981. These trips had no insurance purpose, but involved only Young's other investments *355 that were completely unrelated to the business of Security Associates. The subjects discussed on these other trips included Young's real estate investments in the British West Indies and Florida. Kept on the Mark II during the years at issue was a log book in which each guest was expected to make an entry. That entry would indicate the guest's name, the date of the meeting, and the business purpose of the meeting. Subsequent to the years at issue the yacht and the log kept of its use were destroyed by fire. After the Mark II burned, petitioner held training seminars for his agents occasionally on other vessels or in Young's Florida condominium, but for the most part at local hotels and restaurants in Maryland. In the latter part of 1984 Young or Sunshine Cruises replaced the Mark II with a 54 foot Striker yacht that cost about $500,000. At that time, Young also bought a 44 foot fishing boat for his personal use. In 1980, Security Associates paid Sunshine Cruises, Inc. $80,000 for the lease of the Mark II. In 1981, it paid Sunshine Cruises, Inc. $95,000. These amounts were deducted by Security Associates as "entertainment and selling expenses". Additionally, in 1981, the *356 agency paid the Mark II's captain $8,400 in salary and $1,400 for expenses incurred in connection with his operation of the yacht. For both 1980 and 1981, the lease payments made by Security Associates were Sunshine Cruise's sole source of income. To lease a boat of the sort that Security Associates was using would cost $5,500 a week plus expenses, which could be expected to range from $3,000 to $5,000 a week. The Commissioner, in his notice of deficiency, disallowed the so-called rental deduction of $80,000 and $95,000 for 1980 and 1981, respectively, not only on the ground that it had not been established that they were "ordinary and necessary" business expenses, but also because the requirements of section 274 had not been met. Deductions for the salary and expenses of the boat's captain were disallowed for the same reasons. The respondent states on brief (uncontradicted by petitioners in their reply brief) that the other expenses of the trips on the Mark II, for example the expenses of food and beverages consumed on those trips, were not disallowed and we have no evidence that such expenses were among those disallowed. In the notice of deficiency sent to Young and his wife, *357 the above yacht and captain expenses disallowed to Security Associates were characterized as "preferential dividends" and determined to be "includable in [Young's] taxable income". (a) Deductions of Security Associates. Petitioner contends that these expenses were ordinary and necessary expenses incurred in the conduct of its insurance business and that the Mark II is not properly classified as an "entertainment facility" under section 274(a)(1)(B), IRC 1954. The Government argues that the expenses incurred in connection with the Mark II are not ordinary and necessary because unreasonable in amount. In the alternative, if the expenses are found to be ordinary and necessary under section 162, IRC 1954, the Commissioner argues that the claimed deductions are precluded by section 274, both because related to an entertainment facility and because the business use was not sufficiently substantiated. Although it would appear from the evidence that some portion of the controverted deductions could qualify on this record as "ordinary and necessary" business expenses of Security Associates under section 162, IRC 1954, we need not consider that issue in respect of the corporation *358 because we find that it has not established that the Mark II was not an entertainment facility as that term is defined in section 274(a)(1)(B), which forecloses the allowance of all the deductions in any event. Section 274(a) as amended by section 361 of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2847, and applicable to the years at issue provides as follows: (1) In general. -- No deduction otherwise allowable under this chapter shall be allowed for any item -- * * * (B) Facility. -- With respect to a facility used in connection with an activity referred to in subparagraph (A). The activity referred to in subparagraph A is "an activity which is of a type generally considered to constitute entertainment, amusement, or recreation". As can readily be seen from the language used in section 274 before the changes made in 1978, those changes were intended to substantially restrict the deductibility of expenses in connection with a facility used to any extent for entertainment. Prior to 1978, section 274(a)(1)(B) provided that: (1) In general. -- No deduction otherwise allowable under this chapter shall be allowed for any item -- * * * (B) Facility. -- With *359 respect to a facility used in connection with an activity referred to in subparagraph (A), unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business.
The underlined portion of section 274(a)(1)(B) was stricken from the subparagraph by the 1978 amendment with the consequence that both the primary use of the facility and the degree of the connection between the expense incurred thereon and the taxpayer's business are no longer relevant. Instead, any use of a facility, no matter how small, in connection with "entertainment, amusement, or recreation" under section 274(a)(1)(A) is fatal to the claimed deduction. It is clear that the provision was meant to apply to disallow all expenses with respect to a facility, whether those expenses were true business expenses or not, if any entertainment is found to have occurred on the facility. Congress recognized that "some legitimate business expenses may be incurred with respect to entertainment facilities" but determined that "such expenses should be disallowed as business deductions" *360 in order to discourage the "significant opportunities for abuse" presented by entertainment facilities. S.Rept. No. 95-1263 174 (1978), 1978-3 C.B. (Vol. 1) 472. Those abuses of particular concern were the deduction of "items that essentially represent nondeductible personal expenses" and of expenses "incurred largely as a method of providing additional compensation for highly paid employees and executives". S. Rept. No. 95-1263 at 174. [9]
*361 The definition of entertainment was not changed by adoption of the 1978 amendments. It remains "an activity which is of a type generally considered to constitute entertainment, amusement, or recreation". The regulations dealing with the definition are therefore still relevant. They provide as follows (section 1.274-2(b)(1)(i), Income Tax Regs.): [T]he term "entertainment" means any activity which is of a type generally considered to constitute entertainment, amusement, or recreation, such as entertaining at night clubs, cocktail lounges, theaters, country clubs, golf and athletic clubs, sporting events, and on hunting, fishing, vacation and similar trips, including such activity relating solely to the taxpayer or the taxpayer's family. * * * [Emphasis added.] The question before us under section 274 is whether the Mark II was used in connection with an entertainment activity that would require disallowance of those yacht expense deductions at issue. It is clear from both the language of the section and its legislative history that an analysis of the actual "use in connection with entertainment" is required. S. Rept. No. 95-1263 175 (1978), 1978-3 C.B. (Vol. 1) 473. *362 After considering all the evidence, we cannot find that no such disqualifying use occurred. If all that were at issue were Security Associates' use of the Mark II for agent training and other insurance related meetings, there would be a basis for deciding this issue in petitioner's favor. Agents and other parties involved in these meetings testified at trial and, while their testimony was often rather vague, we find, without strong confidence, that the use of the Mark II in which they were involved was at least in part legitimate business use that did not involve entertainment. [10] The testimony indicated that the Mark II was used for transportation and as a conference room to some extent in connection with the insurance business, and not to that extent for the kind of recreational boating that might be considered to be an entertainment use. We need not make any finding as to the insurance related use of the Mark II, however, since that is not *363 the only use of the vessel that is at issue. The reconstructed log of the Mark II that was presented in evidence indicates that of the eleven trips on the Mark II in 1980 and 1981, only six involved the insurance business of Security Associates. The other five were trips on which Young and investors related to Young's other business ventures were passengers. The record is devoid of any explanation of what occurred on the Mark II during the trips on which other investors were present, beyond that there were "discussions on [Young's] investments in the British West Indies and other areas." Without more, we cannot find that those trips did not involve at least some element of disqualifying entertainment. The record thus not only discloses that there were trips on which the business involved was not that of Security Associates, as required by the statute, but also fails to establish in any event that there was in addition no disqualifying entertainment on any of those trips in each year. While Young testified generally that he made sure that no entertainment occurred on the vessel, he never specifically addressed the non-insurance use of the Mark II. In the absence of any testimony, *364 convincing or otherwise, by either Young or the guests involved in this category of use, we conclude that petitioner has not made its case. Even if we accept that business discussions occurred during these non-insurance related uses of the Mark II, we cannot be reasonably confident that the meetings were not essentially social gatherings or even that some incidental pleasure boating did not occur. That the passengers had some business association and engaged in some business discussion does not, in and of itself, establish that they were invited on the Mark II solely for business reasons. See Challenge Manufacturing Co. v. Commissioner,37 T.C. 650, 660 (1962). (b) Constructive dividends to Young. The Commissioner has determined that Young is chargeable with dividends in respect of the Yacht in the amount of $80,000 for 1980, and $95,000 for 1981, plus additional related amounts of $8,400 and $1,400 for 1981 for the captain's salary and expenses identified with him, respectively. The Government argues that these amounts are includable in the gross income of the individual petitioners as constructive dividends to Young because of his "personal use of a corporate *365 yacht". It has long been established that "[e]xpenditures made by a corporation for the personal benefit of its stockholders or the making available of corporate-owned facilities to stockholders for their personal benefit may constitute taxable income in amounts equal to the fair value of the benefits involved". Challenge Manufacturing Co. v. Commissioner,37 T.C. 650, 663 (1962). In our judgment, Young has failed to prove that at least some of the amounts in issue were not expended on his behalf personally. To be sure, we have indicated above that the evidence establishes that the Mark II was used on some occasions for the benefit of the corporation, Security Associates. But the reason that we approved the disallowance in toto of the deductions claimed by Security Associates for these expenditures was that section 274(a)(1)(B) forbade allowance thereof since it had not been shown that the yacht was used exclusively for the benefit of the corporation or that no entertainment occurred on it. The vessel was used part of the time for Young's personal benefit, including purposes concerning his investments wholly unrelated to the business of Security Associates, *366 without any showing that disqualifying entertainment did not occur on such occasions. And even on the trips when business of Security Associates was conducted we are not satisfied on this record that such business activities were carried on to the exclusion of other activities that could fairly be classified as personal to Young. In the circumstances, we are faced with a dilemma. On the one hand, Young should not be charged with constructive dividends to the extent that the expenditures were made for the benefit of the corporation, even though they were not deductible by the corporation. On the other hand, Young has failed to prove that some of the Mark II's trips were not exclusively for his personal benefit, nor has he convinced us on this record that at least some portion of the other trips could not reasonably be regarded also as personal to him. All such personal benefits should be treated as constructive dividends. The problem can be solved by following the course taken in Henry Schwartz Corp. v. Commissioner,60 T.C. 728, 744 (1973). In Henry Schwartz Corp. certain expenditures were held to be entirely nondeductible by the corporation by reason of *367 section 274, notwithstanding that some of them were in furtherance of its business. Although section 274 precluded us from applying the principles of Cohan v. Commissioner,39 F.2d 540, 544 (2d Cir. 1930), in respect of deductions allowable to the corporation, section 274 did not operate to prevent us from applying those principles to the amount of constructive dividends to be attributed to the stockholder. We accordingly did the best we could with the materials at hand in accordance with Cohan, and we made an allocation, charging the stockholder-beneficiary with a constructive dividend in the amount allocable to him. We take the same road here. In the circumstances, precision is impossible, but we find here on the basis of the evidence, again in accordance with Cohan, that the value of the benefits to Young personally in respect of the use of the yacht was $45,000 in 1980, and $85,000 in 1981. Those amounts are includable in the gross income of the individual petitioners as constructive dividends from Security Associates. Decisions will be entered under Rule 155.
Footnotes
1. Petitioners' three evidentiary objections were withdrawn over the course of the trial. The Government initially objected to ten exhibits. At trial, it withdrew its objections to five of them. As to the other five, we have considered the hearsay and relevancy objections. We find that each of the Exhibits 29-CC, 32-FF, 33-GG, 41-00, and 46-TT, as introduced with no limits on its use, contains inadmissable hearsay. However, in four of the five cases, the declarant testified at trial and thereby put the same evidence into the record in that form. Consequently, these objections served no purpose.↩
2. The expression "general agent" appears to be a term of art in the insurance industry. It seems that a "general agent" of a particular insurance company not only engages in efforts himself to sell such insurance, but ordinarily has a staff including "agents" who also meet with clients and undertake to sell such insurance to them under the direction of the general agent. The entity used by the general agent to carry on his activities, whether a sole proprietorship, corporation, or otherwise, is often referred to as the "agency". That term will so be used herein. ↩
3. There have been various subsequent amendments to that contract.↩
4. We have no evidence that Young's contract itself was ever assigned to Security Associates, as might have been done under the terms of the contract. All that appears in the record is an assignment of Young's commissions and Jefferson's continuing to deal with Young as an individual, not at all with Security Associates. Potentially serious problems could have arisen here based on the doctrine well established in the long line of cases headed by Lucas v. Earl,281 U.S. 111↩ (1930), but no such issues have been raised.
5. These cases have generally followed or been in accord with principles set forth by the Supreme Court in Schlude v. Commissioner,372 U.S. 128, 137 (1963); American Automobile Association v. United States,367 U.S. 687 (1961); Automobile Club of Michigan v. Commissioner,353 U.S. 180↩ (1957).
6. In Whitaker,↩ a stud fee was paid by owner of mare to owner of stud when the mare was determined to be with foal under an agreement requiring refund of the fee if a foal was not born alive. The court held that the fee was income in the year received rather than in the following year upon birth of a live foal.
7. Policies were evidently sold in accordance with two separate contracts in the years at issue. However, the amount sold under the second contract, which contract is not in the record, is so comparatively insignificant that the parties have not argued for different treatment of any amount sold thereunder. ↩
8. The income tax treatment by Security Associates of the agency allowance and the renewal commissions (both of which were reported by it on its returns) is not involved here.↩
9. Petitioner's opening brief makes passing reference, without any development of the point, to sec. 274(e)(6), suggesting that an exception is provided where the vessel is used "primarily" for business purposes of the taxpayer and that the expenses in question satisfy the sec. 274(e)(6) exception as to the facilities provision of sec. 274(a)(1)(B). Although the (e)(6) exception might well have applied prior to the 1978 amendment to sec. 274(a)(1)(B)↩, the very purpose of the 1978 amendment was to remove the "primary" test and to disqualify for deduction a facility otherwise covered unless it is used entirely, not merely "primarily", for the furtherance of the taxpayer's trade or business. Petitioner's point, if it is to be considered at all -- it was not raised in the petition -- has no validity here. For, as previously indicated and as will be further discussed hereinafter, petitioner has not established that the boat was used exclusively in furtherance of its own business.
10. It is a wholly separate question whether this business use of the Mark II that did not appear to involve entertainment, might have been such a lavish and extraordinary expense that it would be considered outside of section 162↩.